STATE OF NEBRASKA, APPELLEE, V.
EDWARD ROBINSON, JR., APPELLANT.
724 N.W.2d 35

Filed December 1, 2006. No. S-05-107.

Susan M. Bazis, of Bazis Law Offices, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

GERRARD, J.

## I. NATURE OF CASE

The defendant, Edward Robinson, Jr., was charged with first degree murder and use of a deadly weapon to commit a felony in connection with the killing of the victim, Herbert Fant. The State contended, at trial, that the victim had been in an argument with the defendant's wife and that as a result, the defendant was angry with the victim. This, according to the State, culminated in a fight in the parking lot of a Popeyes restaurant in Omaha that ended with the fatal shooting of the victim. At trial, the defendant, relying primarily on inconsistencies among the statements and testimony of the State's witnesses, argued that there was a reasonable doubt as to whether the defendant had been the victim's killer. The defendant was convicted of both charges and appeals from his convictions and sentences.

## II. BACKGROUND

### 1. FACTS

Parisee Fant (Parisee), the victim's wife, testified that at the time of the killing, she and her husband had been having difficulties in their marriage. The two were avoiding each other by trying not to be home at the same time. Parisee testified that on February 24, 2003, Parisee and the victim were planning for him to move out of the residence. Parisee spoke to her cousin, Tiffany Newte, about the problems in her marriage. Newte was married to the defendant. Parisee testified that she and Newte were close and spoke often about "[p]roblems, kids, everything," including Parisee's relationship with the victim.

When Parisee spoke to Newte on February 24, 2003, Newte was angry at the victim because of Newte's belief that the victim had been unfaithful to Parisee. Parisee was also angry, and

she spoke to the victim several times that day about the matter. Later that evening, sometime after 8:30, the victim came home and argued with Parisee, and the encounter turned physical. The victim was angry. A friend of the victim, whom Parisee did not know, came into the home and led the victim out. The two men left in the victim's vehicle, which Parisee identified as an orange "Chevy Malibu" with tinted windows that the victim had owned for about 3 or 4 weeks.

Before proceeding further, we note, for the sake of clarity, that witness identification of the makes and models of different vehicles was a significant issue in this case. For instance, although Parisee identified the victim's vehicle as a Malibu, it is identified inconsistently throughout the trial, by different witnesses, as a Chevrolet Malibu, Caprice, or Impala. More important, a white sport utility vehicle that was seen by witnesses leaving the scene of the killing was identified by several of those witnesses as a Cadillac Escalade, and at trial, an essential part of the State's theory of the case was that those witnesses had actually seen a white GMC Yukon Denali owned by the defendant's wife.

About 30 to 45 minutes after the victim and his friend left Parisee, Newte called Parisee, angry and "screaming" such that she was hard to understand. Parisee called the victim and spoke to him about Newte's call. At 11:05 p.m., Parisee received a call from Michael Whitlock, a friend of the victim. As a result of that call, Parisee went to a local hospital, where she was informed that the victim had been shot and killed.

Tasha Brye testified that beginning in November 2002, she had been in an intimate relationship with the victim. Brye spoke to the victim on her cellular telephone sometime between 10 a.m. and noon on February 24, 2003, and then spoke to him again at about 2 p.m. After Brye arrived home from work, she called the victim at around 5 p.m. Brye lived in a home near 30th Street and Ames Avenue, "[w]ithin a couple of blocks of the Popeyes" where the victim was killed. Brye went to a friend's house to play cards, and then received a telephone call from her mother informing Brye that Brye's home burglar alarm was sounding. Brye called the victim and asked him to meet her at her house, then she drove home, arriving at about 6:15 p.m.

The victim met Brye at her home, she talked with him, and then they both left about 10 minutes after arriving.

The victim called Brye several more times that evening. Eventually, as a result of one of the telephone calls, Brye went to check on her home, and the victim arrived while she was there, at about 9:20 or 9:30 p.m. Brye described the victim as "furious." A few minutes later, the victim received a telephone call. The victim became more upset, and left. Brye called the victim again after he left, and they spoke briefly. Brye did not see the victim again before his death.

Daylan Dortch (Daylan) was a friend of the victim. In the afternoon of February 24, 2003, Daylan was at a house at 24th Street and Templeton Drive with his brother James Dortch (James), Whitlock, Andrew Cobb, another individual, and the victim. The house at 24th Street and Templeton Drive was a "hang-out spot" where Daylan and his friends played video games. Daylan testified that the victim seemed "frustrated." Daylan, Whitlock, Cobb, and the victim remained at the house smoking marijuana for a couple of hours, then "just went riding." Eventually, they returned to the house. The victim was using a cellular telephone, talking to someone Daylan believed to be the victim's girl friend. Daylan and the victim left again. Daylan testified that "[the victim] was kind of frustrated. He was like he needed somebody to ride with. I just rode with him." They took the victim's car, described by Daylan as an "orange Chevy Caprice," with four doors, and dark, tinted windows.

Daylan testified that they went to the house where the victim lived with Parisee, and Daylan waited outside in the car for about 20 minutes. When Daylan went up to the house to see what was happening, he found that the victim and Parisee were fighting. Daylan attempted to calm the victim, then left with him. Daylan testified that they took the "Interstate" to Florence Boulevard. The victim was "[r]eal frustrated then" and "real mad." The men arrived at a house on Florence Boulevard. Although Daylan was not able to be more specific about the location, other evidence established that Newte lived on Florence Boulevard, about a 7- to 10-minute drive northeast from the victim's residence.

Daylan said that after they arrived, the victim got out of the car, knocked on the door of the house, then knocked on the

window. A female came to the window, and she and the victim began shouting at one another. The men left and returned to the house at 24th Street and Templeton Drive. The victim, Daylan, Whitlock, Cobb, James, and Damion Jackson were there at that time. The victim continued to use his telephone, and the others tried to calm him down. The victim said he did not want to stay, and although the others attempted to persuade him to stay, he left, accompanied by Jackson.

Later that evening, James received a telephone call from Shaquata Mayfield, who told James that the victim had been shot. James, Daylan, Cobb, and Whitlock got in a car and went directly to the scene of the killing. The police arrived and took all the men into custody for questioning.

Whitlock, a close friend of the victim, also testified regarding the events of February 24, 2003. Whitlock testified that on that afternoon, he, Daylan, and Jackson had been "[j]ust riding" with the victim in the victim's car. Whitlock identified the victim's vehicle as a burnt orange 1995 "Chevy Impala SS," with very dark, tinted windows. They returned to the house on 24th Street, and the victim and Daylan left again, then returned. Whitlock agreed that the victim seemed "pretty upset," both before the victim and Daylan left the house and after they returned.

Whitlock testified that after the victim and Daylan left, Whitlock received a call on his cellular telephone from the defendant. Whitlock testified that although he had known the defendant for some time, it was unusual for Whitlock to speak to the defendant. According to Whitlock, the defendant asked Whitlock for the location of the victim:

> He just said — he asked where [the victim] was at and I was like, I don't know. He was like, Well, [the victim] came by my girl['s] house trippin' and callin' her all out of her name and disrespecting her, and I'm looking for him. I was like, Well, I can't give you the number, but I'll call you back.

The defendant hung up, and Whitlock called the victim. Ten or fifteen minutes later, the defendant called again. Whitlock said that "when he called, I said, Hello. He was like, Man, [the victim's] wrong for coming by my house disrespecting my girl like that. You don't go by nobody['s] house and disrespecting. And then he was like, I don't want to have to pop him." Whitlock

testified that later, the defendant called again. "He said, Are you with [the victim]? And I said, What? And he said, Is you with your boy? Is you in that Impala? And then I said, No." Whitlock testified that 4 or 5 minutes later, James got the call that the victim had been shot. The men got into James' car and went to the scene. Whitlock called Parisee at that point.

Cellular telephone records entered into evidence generally supported the testimony given by the State's witnesses at trial, both with respect to when and to whom calls were made, and the general location of the victim's telephone and the defendant's telephone when the calls to and from them were connected. The technical details of the telephone records and cellular site location data will be discussed below, but the most pertinent telephone records are summarized as follows:

A call was made from Newte's telephone to the defendant's telephone at 7:51 p.m. on February 24, 2003, connecting to the defendant's telephone through a cellular telephone tower at 46th and Farnam Streets. At 10:01 p.m., two more short calls were made from Newte's telephone to the defendant's telephone, connecting to the defendant's telephone from the northeast sector of a tower at 16th and Farnam Streets, serving the area of 11th and Nicholas Streets, where the defendant's business was located. At 10:09 p.m., the defendant's telephone received another call from Newte's telephone, connected through a sector aimed southeast from a cellular site located at 3600 North 24th Street, west of the defendant's business, but still east of the location of the killing.

At 10:15 p.m. on February 24, 2003, a call was made from the defendant's telephone to Whitlock's telephone, connecting to the defendant's telephone through the southeast sector of a tower at 30th and Fort Streets, extremely close to—and aimed at—the location of the killing. At 10:16 p.m., a call was placed from Whitlock's telephone to the victim's telephone, connecting to the victim's telephone through the southwest sector of the tower at 3600 North 24th Street, close to Brye's residence. At 10:17 p.m., a call was placed from the victim's telephone to the defendant's telephone.

The 10:17 p.m. call on February 24, 2003, from the victim's telephone to the defendant's telephone connected to the victim's telephone through the tower near Brye's residence, but another

call was placed from the victim's telephone to the defendant's telephone at 10:22 p.m., connecting to the victim's telephone through the tower at 30th and Fort Streets near the Popeyes restaurant where the crime would be committed. Both calls connected to the defendant's telephone through the 30th and Fort Streets tower. In other words, by 10:22 p.m., the last time the victim's telephone called the defendant's, both telephones were using the same tower.

Two more calls were received on Whitlock's telephone from the defendant's number at 10:30 and 10:36 p.m. on February 24, 2003, again connecting to the defendant's telephone through the 30th and Fort Streets tower. At 10:52 p.m., an outgoing call was placed from Whitlock's telephone to Parisee and the victim's home.

Mayfield was working at Popeyes at the time of the shooting. Mayfield testified that the front counter of Popeyes had closed at 8 p.m. but that the drive-through remained open until 10 p.m. Mayfield was working until closing that day, along with her manager and a cook. As 10 p.m. approached, there were no customers at the drive-through and Mayfield was cleaning the restaurant in preparation for closing.

As Mayfield was sweeping, an orange car pulled into the parking lot. Mayfield recognized the car, having seen Whitlock riding in it. At trial, Mayfield identified several individuals whom she knew to regularly ride in that car: Whitlock, Daylan, James, Jackson, and a man Mayfield knew only as "Herb," later identified as the victim. The car backed into a parking space.

Mayfield went into the bathroom to change clothes. When she came out, she saw the victim and two other men in the parking lot. She testified that two of the men were moving their hands and appeared to be talking: the victim and another, shorter man. Mayfield described the shorter man as wearing "a black hoodie or some kind of black jacket and some dark jeans." The victim was wearing just a T-shirt and was much taller than the person with whom he was talking. Mayfield testified that the third man was taller, "about as tall as [the victim]," and was wearing a black coat. Other evidence at trial established that the defendant had been shorter and smaller than the victim. Mayfield saw the third man trying to separate the victim and the shorter man.

Mayfield also saw that a dark blue or black van had appeared in the parking lot, along with a white sport utility vehicle. She saw two people in the white vehicle, which she described as having four doors. She also saw a dark green car, which pulled in behind the white vehicle but then backed out and left. Mayfield said that she was "walking back and forth towards the window [and] trying to tell the white truck the drive-thru was closed, but I guess they weren't trying to order no chicken so they sat there."

Mayfield testified that while she was at the window, Joe Lockett called Mayfield on her cellular telephone. Mayfield's telephone records confirmed that at 10:40 p.m. on February 24, 2003, Mayfield received a call from a telephone number used by Lockett. Mayfield testified that she and Lockett spoke about the green car that had backed out of the parking lot, although the precise content of this conversation is not reflected in the record. Then, Mayfield testified that while she was standing at the window,

> [t]he white car — I seen — well, somebody hopped out and ran out, but I never seen 'em come to the front. And when I went back to the window, the shorter man had the gun in his hand and him and [the victim] was standing face-to-face to each other and he just shot.

After seeing the victim get shot, Mayfield ran to the office in the back of the restaurant and called James, because she knew him to be a friend of the victim, and she told James that the victim had been shot. Mayfield's manager called the 911 emergency dispatch service.

Lockett called Mayfield again after the shooting. Mayfield testified that Lockett asked her if she was okay, then said, "If the police ask, tell them it was Fast Eddie." "Fast Eddie" was the defendant's nickname. Mayfield replied that she would not tell the police that "Fast Eddie" was the killer, because she did not recognize the killer and did not know "Fast Eddie." When James arrived, seconds after Mayfield had called him, Mayfield came out of the office and met James, Cobb, Whitlock, and Daylan. The police arrived later and prevented everyone from leaving, so Mayfield called Lockett, because she saw him outside talking to Jackson. Mayfield's cellular telephone records verify two calls between her telephone and Lockett's telephone.

Lockett testified that he had not known the victim personally, but had seen him around, with Jackson, Whitlock, and Daylan. In February 2003, Lockett had been dating Ramona Clark and was living in a house on North 28th Avenue, a short distance from the scene of the crime. Lockett was living with his mother at the time, and Lockett's brother lived a few doors to the south. Danny Robinson, Sr. (Robinson), the defendant's brother, also lived on 28th Avenue, down the street from Lockett's mother. Lockett used to speak to Robinson when he came down the street to Lockett's brother's house. Lockett testified that he had seen Robinson driving an older-model "black Chevy van." Lockett said that on occasion, the defendant visited Robinson's home. Lockett testified that he also knew the defendant, from seeing him on the streets and from a visit to the defendant's business.

Lockett testified that on February 24, 2003, he had dropped Clark and her sister off at work near 90th and Maple Streets, and picked them up after their shift ended at about 10 p.m. Lockett and Clark dropped Clark's sister off at a house on 26th Avenue, south of Fort Street, and drove toward 30th Street and Ames Avenue. Lockett testified that Clark wanted something to eat, so they headed north on 30th Street to see if Popeyes was open. Lockett testified that as they approached the restaurant, they saw the victim's car, which he identified as an "orange Caprice," and Mayfield's car. Lockett knew Mayfield because he had dated a friend of hers, and he knew that Mayfield's car was there because she worked at Popeyes.

Lockett said that as they got closer, he noticed people arguing, and that Robinson's "black Chevy van" was there. Lockett also saw a white truck that Lockett identified as "a Cadillac Escalade, an Escalade truck," a big sport utility vehicle, although Lockett said he was not really able to determine what type of model it was. Lockett testified that he saw five people in the parking lot, specifically identifying the victim, the defendant, and Robinson, as well as a person identified by Lockett only as "Shamika," whom Lockett knew. The victim and the defendant were facing one another, and Robinson was off to the side. Lockett drove to 29th and Fort Streets, turned around, and drove back past the restaurant.

Lockett testified that he saw the victim standing in the parking lot without a coat on and that the victim and the defendant were "pointing at each other." The defendant was standing close to the victim and had his finger in the victim's face. Lockett passed by and turned around again, "seeing what was going on." Lockett called Mayfield, and they had a short conversation.

Lockett entered the parking lot of a drive-in restaurant across 30th Street from Popeyes, to watch what happened. Lockett said that the victim and the defendant began "tussling, tussling and finger pointing" and "that's when the gun came out. Then that's when [the defendant] shot [the victim]." Lockett testified that he saw the defendant take a gun from Robinson and shoot the victim once and that when the victim tried to get back into his car, the defendant shot the victim again. Lockett said he heard "like four or five" gunshots at that time. Lockett testified that the victim made it back to his car, while the defendant was moving toward the victim, "still shooting, shooting the gun." The victim opened his car door and grabbed a cellular telephone, which Lockett could see because "the blue lights on the phone had came on the phone."

Lockett said that the defendant and Robinson got in the black van and left the scene. The van went over the curb and headed east on Fort Street, while the white sport utility vehicle went around to 30th Street, then went east on Fort Street in front of the van. Lockett did not see where the vehicles went after that.

Lockett called Mayfield and had two short conversations with her after the shooting. Lockett and Clark left the drive-in parking lot and went north on 30th Street to Fort Street, and they proceeded east on Fort Street to LaTonya Bell's house at 25th and Fort Street. Lockett identified Bell as his aunt, although Bell later identified herself as Lockett's first cousin. They stayed for a few minutes, then left and went back up to 30th and Fort Streets. Lockett testified that they saw the white sport utility vehicle that had been at the crime scene parked at the corner of 27th and Ellison Avenue, with the police behind it. They returned to the crime scene, parking east of the location and walking to the parking lot, where they saw Jackson, Whitlock, James, and Daylan. Lockett did not speak to police at the scene.

Clark testified in substantial agreement with Lockett's trial testimony. However, Clark testified that she and her sister left work between 10:15 and 10:30 p.m., rather than right at 10 p.m., as Lockett had testified. Clark testified that when the shooting took place, she was looking for her cellular telephone because it was ringing and that by the time she looked up, the shooting was over. Clark did not recognize the killer at the scene of the crime and was unable to identify the defendant at trial as having been the killer.

Ollie Blake, a jitney driver for North Side Delivery, had been working in the area of 30th and Fort Streets on February 24, 2003. Blake was traveling northbound on 30th Street and stopped at a red light at Fort Street. Blake saw "a couple of guys fighting in the Popeyes parking lot." Specifically, he saw four men in the parking lot and two of the four were fighting. Blake also recalled seeing two vehicles in the parking lot: an "orange Chevy Caprice" and a "white Cadillac Escalade with a dented fender." The men were fighting next to the driver's side of the orange car.

According to Blake, one of the men fighting was wearing a white T-shirt and was larger than the other men. Blake described the other men as wearing brown "nanny goat fur coat[s]," that Blake said had fur on the outside and a fur-lined hood "like an Eskimo coat." Blake saw the man in the T-shirt knock down the man in the coat that he was fighting. Blake could not see the other man's face, but could tell from his hands that he was black. The man fighting in the coat was knocked down "about two or three times," then one of the other men handed him a gun. Blake testified that the man wearing the T-shirt was "shot about four times in the chest up close" by the shorter man whom he had been fighting.

Blake made a right turn at the red light and called 911. As Blake was driving eastbound on Fort Street, he saw someone run down 29th Street on foot, followed by the white sport utility vehicle. Blake was still on the telephone with the police when he picked up his customer and drove back to 28th Avenue and Fort Street and saw the white sport utility vehicle turn off of 28th Avenue and proceed eastbound on Fort Street.

Leslie Daughtry, a manager of the drive-in restaurant across the street from Popeyes, testified as a defense witness. Daughtry

testified that she was working until closing time on the night of the killing; closing time that night was 11 p.m. Daughtry said that as she and her coworker, Daniel Payton, were leaving, she heard gunshots. She got in the vehicle being used to give them a ride home and said that she had heard shots. The driver went directly on to 30th Street and took Daughtry home. She did not see any other vehicles in the drive-in parking lot and did not see anything in the Popeyes parking lot other than the victim's feet hanging out of his car.

Payton testified that after he heard the gunshots, he looked toward Popeyes and "saw a[n] individual running east on Fort Street there and then I saw a white Suburban . . . on Fort Street going east." Payton did not observe any other vehicles in the drive-in parking lot either. On cross-examination, Daughtry admitted that she would have been leaving sometime between 11:15 and 11:30 p.m. Payton testified that although he was "not pretty sure," he recalled leaving between 11:30 and 11:50 p.m., but "[i]t could have been [earlier], because it was during winter and we're slow at that time."

Rosemary Burdess, an officer with the Omaha Police Department, was on duty at the time of the shooting. She and her partner were notified of a shooting at the Popeyes restaurant at 29th and Fort Streets. The officers were advised by dispatch that the suspect was a black male wearing a black hooded sweatshirt who left the scene on foot, eastbound, possibly toward a white Cadillac Escalade.

Burdess testified that they arrived at the scene within 2 minutes of the call and did not see the suspect or the vehicle. They saw three men standing next to the victim's vehicle, identified as an orange Chevrolet Impala. The orange car was facing east, backed into the parking lot. The officers saw the victim on the driver's side of the vehicle, leaning toward the passenger's side. Burdess checked on the victim and found that he was still alive, "breathing kind of heavily, making a gurgling sound." Medics arrived 2 to 3 minutes later and placed the victim in an ambulance. The victim evidently died after he was taken from the scene.

Matt Chandler, an Omaha police officer, was also on duty on the night of February 24, 2003. He was at 30th Street and Laurel Avenue, a little over six blocks northwest of Popeyes, when he

also received the radio call reporting the shooting. Information about a suspect was provided, indicating that a white Cadillac Escalade was eastbound on Fort Street, a black- or dark-colored minivan was involved, and one suspect was a black male wearing a dark hooded sweatshirt. Chandler drove south on 30th Street and east on Ellison Avenue "in order to kind of parallel the suspects' escape route."

Chandler drove about three blocks and discovered a white GMC Yukon Denali parked on Ellison Avenue at 27th Street, on the south side of the street, facing eastbound. The vehicle was approximately six blocks away from 30th and Fort Streets, although Chandler testified that in that area, because of the size of the blocks, the distance was "more actually like four blocks away." The Yukon Denali was registered to Newte. Chandler got out of his car and approached the Yukon Denali, which he found to be unoccupied. Chandler removed his gloves, felt the tailpipe of the Yukon Denali, and found it to be almost too hot to hold, indicating to Chandler that it had been recently driven. There was no apparent damage to the front of the vehicle.

Michael Kershisnik, a security guard, testified as a defense witness. On the night of the killing, Kershisnik was working at a steakhouse located at 30th and Fort Streets just north of Popeyes. Kershisnik was in his vehicle near the back door to the kitchen when he heard gunshots. Kershisnik got out of his vehicle and headed toward the steakhouse parking lot's Fort Street exit gate. Kershisnik made it about halfway across the parking lot, from where he saw one individual on foot, wearing a dark, heavy coat, and two vehicles leave the Popeyes parking lot. Kershisnik identified the two vehicles as a "large white SUV and a dark colored mini-van." After police arrived, they transported Kershisnik to the area of 27th and Ellison Avenue to look at the GMC Yukon Denali that had been found there. However, Kershisnik said that the Yukon Denali was not the same vehicle that he had seen leaving the Popeyes parking lot, because the vehicle he had seen leaving the parking lot was cleaner than the vehicle at 27th and Ellison Avenue.

An Omaha police officer and a crime laboratory technician processed the victim's vehicle, an "orange Chevy Impala," at the Omaha police tow lot the next day. A cellular telephone was

found on the floor of the victim's car. The cellular telephone was owned by the victim's mother, but the billing address was the victim's. This was the telephone that the victim was eventually found to have used to make the telephone calls described above.

Michael Kozelichki, an Omaha Police Department detective, was responsible for the investigation of the pearl-colored 2000 GMC Yukon Denali that had been towed from 27th and Ellison Avenue. The vehicle was searched at the Omaha police impound lot on February 25, 2003. Kozelichki determined that Newte, the defendant's wife, was the registered owner of the vehicle. Kozelichki also testified that Robinson, the defendant's brother, lived on North 28th Avenue, between Ellison Avenue and Fort Street, near where the vehicle had been found.

An autopsy was performed on the victim by a specialist in medical pathology. The pathologist found multiple gunshot wounds to the victim's body, and four bullets were retrieved from the body. Based on the autopsy, the pathologist opined that the cause of death was the multiple gunshot wounds.

A senior technician in the Omaha Police Department crime laboratory microscopically examined six spent .32-caliber shell casings recovered from the Popeyes parking lot after the killing. The technician also examined one of the bullets taken from the victim's body at the autopsy. The technician did not testify at trial, but the parties stipulated that had he been called to testify, he would have opined that the six spent shell casings were all fired from the same weapon. He would also have opined that the bullet retrieved from the victim was consistent with bullets of .32 caliber and with the .32-caliber casings found in the Popeyes parking lot.

Karl Koch, an Omaha police officer, was also on duty on the evening of February 24, 2003. After about 20 or 30 minutes of controlling traffic at the crime scene, Koch was instructed to proceed to a business on North 11th Street. Koch did so and, accompanied by other officers, made contact with an individual in an automobile body shop at that location. The individual identified himself as the defendant, and he was handcuffed and searched. The defendant was calm and did not ask why he was being handcuffed. The defendant was wearing light gray sweatpants and a light gray sweatshirt. Inside the building, the officers discovered

the defendant's nephew, Damar Haywood, who acted like he had been sleeping on the sofa. Koch transported the defendant to a police station interview room.

More factual details will be set forth in our analysis below to the extent they are necessary to our discussion of the defendant's specific assignments of error.

## 2. PROCEDURAL HISTORY

On October 16, 2003, the defendant was charged by information with one count of first degree murder and one count of use of a deadly weapon to commit a felony. An amended information, filed July 9, 2004, also charged the defendant with being a habitual criminal. The defendant filed a notice of alibi defense, asserting he was not at the scene of the crime, but at his place of business, at the time of the killing.

After a jury trial, the defendant was found guilty of first degree murder and use of a deadly weapon to commit a felony. Thereafter, the defendant filed a timely motion for new trial, which was denied.

A hearing was had on whether the defendant was a habitual criminal, at which hearing the State adduced evidence that the defendant had previously been convicted, pursuant to guilty pleas, of a state burglary charge and a federal charge of conspiracy to distribute a controlled substance. The defendant objected to the evidence relating to the federal conviction, arguing that the evidence did not show that the defendant had counsel at the time he entered his plea. The court overruled the objection and found that the defendant was a habitual criminal.

The court sentenced the defendant to life in prison on the conviction of first degree murder and, as a habitual criminal, to 10 years' imprisonment on the conviction of the use of a deadly weapon to commit a felony, sentences to be served consecutively.

## III. ASSIGNMENTS OF ERROR

The defendant assigns, consolidated and restated, that the trial court erred in

(1) not finding that the State exercised a peremptory challenge to remove a juror for no reason other than race, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986);

(2) overruling the defendant's objection to the admission into evidence of cellular telephone records, because (a) the records did not fall within the business records exception to the hearsay rule and (b) location data contained in the records required a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001);

(3) overruling the defendant's objection to the admission into evidence of a coat found in the possession of the defendant's nephew;

(4) failing to grant the defendant's motions based upon the insufficiency of the evidence (a) to establish the defendant's guilt beyond a reasonable doubt and (b) specifically to prove that the crime was committed with deliberate and premeditated malice;

(5) not finding that the State committed misconduct during opening and closing statements in its arguments with respect to (a) location data contained in cellular telephone records, (b) a telephone call to the defendant's telephone from an employee of his business, (c) the customization of the defendant's vehicle, (d) an eyewitness misidentification of the model of the victim's vehicle, and (e) the jury instruction on lesser-included offenses of first degree murder;

(6) accepting evidence relating to the defendant's federal conviction for conspiracy to distribute a controlled substance and finding the defendant to be a habitual criminal, because the evidence did not show that the defendant was counseled when he entered his plea of guilty to the federal charge; and

(7) delaying the removal of (a) a juror who had contact with the victim's widow and (b) a juror who was sleeping during the trial.

The defendant also assigns, separately, that the court erred in overruling his motion for new trial. However, the reasons that the defendant argues that his motion should have been granted are addressed in the defendant's other, more specific assignments of error. We need not consider the defendant's motion for new trial separately, as the issues raised by that motion are subsumed in the defendant's other assignments of error.

## IV. ANALYSIS

### 1. *BATSON* CHALLENGE

#### (a) Background

There were four African-Americans remaining in the venire after it had been passed for cause, and the State exercised peremptory challenges on two of the four, leaving two African-Americans on the jury. Jurors Nos. 181 and 278 were the two African-Americans removed from the jury by the State. The record does not precisely reflect the total number of peremptory challenges used by the State, but does show that juror No. 278 was the subject of the State's 12th peremptory challenge. Juror No. 278 was a schoolbus driver for the Omaha Public Schools who lived at 36th Street and Laurel Avenue, near the scene of the killing, but who said he did not know about anything that happened in the case. The defendant conceded, and the court agreed, that the State had valid nondiscriminatory reasons for striking juror No. 181. However, the defendant objected to the striking of juror No. 278, based on *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

The State argued that the defendant had not made a prima facie case for a *Batson* objection, because other African-Americans in the venire had not been stricken by the State. However, the State also explained that juror No. 278 had been stricken because he lived in the area and was a schoolbus driver in the area where the defendant's children went to school. The State also said that juror No. 278's demeanor seemed negative toward the prosecution. Specifically, the State said that juror No. 278 had been crossing his arms and scowling at the State. The court indicated that it had not witnessed that demeanor, but it was "something in good faith you say you observed."

The court overruled the defendant's objection. The court explained that

> first of all . . . it's incumbent upon the courts to find that there was a discriminatory intent on the part of the prosecutor and that the findings or the findings of fact or the facts or the reasons for eliminating the juror were racially motivated or, in turn, if they were racially neutral, then you have to find some type of overriding discriminatory plan on the part of the prosecution.

In this case I can find no overt discriminatory plan on the part of the prosecution. Two of the possible four African-American citizens have been kept on the jury, as it stands right now. There have been racially neutral statements made by the prosecution, one of location of the residence of the juror in question; secondly, the juror's position as a school bus driver within OPS and also the body language which has been stated by the prosecutor. Each one of those would be — could be viewed to be racially neutral. I cannot find that the — that there's enough evidence to show that there is a plan for racial discrimination of elimination of that prospective juror.

Therefore, the Batson challenge . . . is denied.

### (b) Standard of Review

A trial court's determination of whether a party has established purposeful discrimination in jury selection is a finding of fact and is entitled to appropriate deference from an appellate court because such a finding will largely turn on evaluation of credibility. *State v. Lowe,* 267 Neb. 782, 677 N.W.2d 178 (2004). A trial court's determination that there was no purposeful discrimination in a party's use of his or her peremptory challenges and a trial court's determination of the adequacy of a party's neutral explanation of its peremptory challenges are factual determinations that will not be reversed on appeal unless clearly erroneous. See *id.*

### (c) Analysis

In *Batson, supra,* the U.S. Supreme Court held that the Equal Protection Clause of the 14th Amendment forbids prosecutors from using peremptory challenges to strike potential jurors solely on account of their race. See, also, *Lowe, supra.* The defendant argues that the State exercised a peremptory challenge to remove juror No. 278 solely on account of his race.

The evaluation of whether a party has used peremptory challenges in a racially discriminatory manner is a three-step process. See, *Rice v. Collins,* 546 U.S. 333, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006); *Lowe, supra.* First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor has exercised peremptory challenges on

the basis of race. See *id.* A defendant satisfies the requirements of this step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. *Johnson v. California*, 545 U.S. 162, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005). Second, if the requisite showing has been made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. See, *Rice, supra*; *Lowe, supra.* Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. *Rice, supra.* Third, the trial court must then determine whether the defendant has carried his or her burden of proving purposeful discrimination. See, *Rice, supra*; *Lowe, supra.* The final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. *Rice, supra.*

In this case, while there was some question whether the defendant had made a prima facie case at the first step in the analysis, the State was asked to tender a race-neutral explanation for the strike, and the trial court evaluated the persuasiveness of that explanation in determining, pursuant to the third step, that the defendant failed to carry his burden of proving a racial motivation for the strike. Thus, whether or not the defendant made a prima facie showing is moot, and we consider whether the trial court's final determination was clearly erroneous. See, *Hernandez v. New York*, 500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *Jacox v. Pegler*, 266 Neb. 410, 665 N.W.2d 607 (2003).

 The defendant argues, first, that another juror who lived in the area, who was not African-American, was not stricken by the State. If a prosecutor's proffered reason for striking an African-American panelist applies just as well to an otherwise-similar non-African-American who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered in the third step of the *Batson* analysis. *Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005). However, the same factors used in evaluating a juror may be

given different weight depending on the number of peremptory challenges a lawyer has, and a strict comparison analysis may not properly take into account the variety of factors and considerations that may be part of a lawyer's decision to select certain jurors while challenging others that may appear to be similar. See *People v. Johnson*, 47 Cal. 3d 1194, 767 P.2d 1047, 255 Cal. Rptr. 569 (1989).

We first note that the prosecutor in this case did not rely solely on juror No. 278's residence in the area. Moreover, the record indicates that the non-African-American potential juror upon whom the defendant's argument is based, juror No. 301, lived in the area of 42d Street and Vernon Avenue, which juror No. 301 indicated in voir dire was "fairly close" to the scene of the crime at 30th and Fort Streets. The record from jury selection does not indicate the relative proximity of the crime scene to either 42d Street and Vernon Avenue or 36th Street and Laurel Avenue, other than the obvious inference that 30th Street is about half as far from 36th Street as it is from 42d Street. On this record, remembering that the burden of proving intentional discrimination is always on the defendant, we cannot conclude juror No. 301 was "otherwise similar" to juror No. 278 aside from race, such that the trial court's conclusions were clearly erroneous.

The defendant also argues, with respect to the State's observation that juror No. 278 had his arms crossed and was scowling at the prosecutors, that "[n]either the court nor [the defendant's] counsel ever saw [juror No. 278] do either of these things." Brief for appellant at 29. In other words, the defendant argues that the record is not sufficient to support this race-neutral reason articulated by the State for the strike.

The defendant does not take issue with the general proposition that the demeanor of a potential juror can be a legitimate, race-neutral reason for a peremptory challenge. See, *State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999); *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993). See, also, *U.S. v. Marrowbone*, 211 F.3d 452 (8th Cir. 2000); *Yarborough v. State*, 947 S.W.2d 892 (Tex. Crim. App. 1997); *State v. Higginbotham*, 917 P.2d 545 (Utah 1996); *People v. Munson*, 171 Ill. 2d 158, 662 N.E.2d 1265, 215 Ill. Dec. 125 (1996). Cf.,

*Purkett v. Elem*, 514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (prosecutor's proffered explanation for peremptory challenge, that juror had long, unkempt hair, moustache, and beard, was race-neutral and satisfied prosecution's burden of articulating nondiscriminatory reason for strike); *State v. Rowe*, 228 Neb. 663, 423 N.W.2d 782 (1988) (explaining, as possible basis for peremptory challenge, value of observing prospective jurors' demeanor during voir dire). As we explained in *Bronson*, 242 Neb. at 945, 496 N.W.2d at 893:

> [W]e are cognizant of the importance of achieving a venire made up of jurors who, at least during voir dire, (1) respond to the attorneys, (2) do not give off the impression through body language, eye contact or otherwise that he or she has already made up his or her mind, and (3) exhibit a receptiveness to follow the administrative instructions, as well as courtroom testimony in order to make a fair and impartial decision in the matter at hand.

Instead of challenging this principle, the defendant seems to suggest that such observations of demeanor are insufficient to support a strike unless corroborated for the record by opposing counsel or the court. However, the fact that the observations of a challenging party are unconfirmed may affect the trial court's determination of the persuasiveness of an explanation, but confirmation is not necessary for a party's observation of a potential juror's demeanor to form the basis of a race-neutral explanation for a peremptory challenge. See, *Yarborough, supra*; *Higginbotham, supra*; *Munson, supra*. But see *Dorsey v. State*, 868 So. 2d 1192 (Fla. 2003). This is in part because a record of the demeanor of a potential juror would be extraordinarily difficult to make. Behavior noticed by one party, and related in good faith, may simply not have been seen by the opposing party or the court. Bringing the matter up in court could prejudice the other potential jurors, and the complained-of conduct might not even be present by the time it is called to the court's attention. A person's demeanor is also subjective and subject to more than one interpretation. Therefore, even if the court's observation and interpretation differs from that of the challenging party, it would not necessarily be dispositive. See *Munson, supra*. In short, "[t]he impracticality of requiring a trial judge to take note for the

record of each prospective juror's demeanor with respect to his or her ongoing contacts with the prosecutor during voir dire is self-evident." *People v. Reynoso*, 31 Cal. 4th 903, 929, 74 P.3d 852, 869, 3 Cal. Rptr. 3d 769, 790 (2003).

■ Instead, while confirmation that the trial court observed the same demeanor as did the challenger would lend credence to any purported race-neutral explanation, it is sufficient that the court must closely examine such explanation in light of its observation and other relevant factors. *Munson, supra.* "Although trial courts should be particularly sensitive when facial expressions or body language alone is advanced as the reason for striking a minority juror, these reasons provide a sufficient basis to support the exercise of a peremptory challenge." *State v. Higginbotham*, 917 P.2d 545, 548 (Utah 1996). Although a party could attempt to use subjective evaluations of potential jurors to disguise violations of the Equal Protection Clause, this does not mean that such evaluations must always be disregarded. "Trial judges are not without ability to detect pretexts." *Yarborough v. State*, 947 S.W.2d 892, 896 (Tex. Crim. App. 1997).

■ Here, although the State's observations were not corroborated, the prosecutor's stated reason for the strike specifically described the body language and nonverbal actions that led the prosecutor to believe that juror No. 278 was hostile toward the State. The trial court also relied on the fact that two African-Americans were seated on the jury, although the State had sufficient peremptory challenges to have stricken them as well. While a pattern of strikes is not required to show an Equal Protection Clause violation, as the use of even a single peremptory challenge on racial grounds is a violation of equal protection, the lack of a pattern may be considered when evaluating the credibility of a race-neutral explanation for a challenge. See, *State v. Lowe*, 267 Neb. 782, 677 N.W.2d 178 (2004); *State v. Thompson*, 231 Neb. 771, 438 N.W.2d 131 (1989); *State v. Alvarado*, 226 Neb. 195, 410 N.W.2d 118 (1987).

In short, where there is nothing in the record to affirmatively contradict the State's race-neutral justification for exercising a peremptory challenge on juror No. 278, we cannot say that the trial court's conclusion that the defendant did not prove purposeful discrimination is clearly erroneous.

## 2. Cellular Telephone Records

### (a) Background

Prior to trial, the defendant made a motion in limine with respect to the defendant's cellular telephone records, complaining that the State had gathered data regarding the locations of the towers through which the defendant had placed telephone calls. The defendant argued that the location data were not scientifically reliable. The court replied that such data "could be, theoretically, subject to a Daubert type of hearing. I mean, I don't know." The defendant contended that it could not be said "a hundred percent that that's where [the defendant] was at that location because they can bounce towers." The defendant argued, in sum, that the evidence

> should not be submitted because we may have to have what I would say is a Daubert type hearing, or if they can present evidence prior to it coming in where if the Court's going to deem it a business record exception, I guess we can deal with that. I think that's going to be their position to get it in. However, I think it still has to be reliable to come in, even for a business records exception. In regard — in particular to the tower, I don't know that it does.

The State responded by contending that the evidence would not be used to show that "this person is standing here," but for location purposes in terms of the tower. The State argued that the evidence would show when the defendant's cellular telephone was used to make a call and what tower was utilized for that call and that each tower generally had a range of approximately a half-mile or 1-mile area. The relevance of the data would be based on "the use of that phone, where defendant is specifically identified using that phone and the tower that was used." The defendant contended that the location data were unreliable because the evidence would be that "it's probable that that's the tower he used but it's possible that he was somewhere else and hit that tower instead."

In overruling the motion in limine, the court stated that "[m]aybe you have to have a Daubert hearing on it, I don't know." But the court concluded that if the business records exception to the hearsay rule was met with respect to data indicating the

use of a particular tower, then the State could adduce that evidence without a *Daubert* hearing. The court indicated that left "plenty of room" for the defendant to eliminate the inference that the defendant was at a precise location. The court overruled the motion in limine, pending the State's presentation at trial of proper and sufficient foundation for the evidence.

### (i) Alltel Communications Records

At trial, Susie Mason, a records custodian for Alltel Communications (Alltel), described the recordkeeping process for wireless telephones. Mason explained that when a customer first subscribes to a wireless service, personal information is obtained from the customer. That information is retained permanently. Once service is established, a telephone number is assigned to that particular account and housed in a centralized billing system. For billing purposes, data are retained for each account regarding calls that are received and placed.

Mason testified that Alltel often received requests for such data pursuant to subpoenas, court orders, or search warrants. Mason's primary duty was handling those requests. To do so, she typically queried either by name or telephone number to retrieve the name of the account holder, telephone number, billing address, and sometimes a contact telephone number. That information was printed out.

Mason also described the process by which cellular telephone calls are made. Mason explained that a cellular telephone maintains regular contact with cellular towers. The telephone is identified by a serial number to the cellular site. When a call is placed from a telephone,

> [o]nce you place the call, it verifies who you are, go[es] ahead and place[s] the call for you. That call is automatically registered. It lets us know what time you placed the call, what location you were in when you placed the call.
>
> As you're traveling around town, it also keeps a record of the various cell sites as you're driving or wherever you are. And the call, it lets us know when you end the call, from start to finish.

Once a call is placed or received, those data are kept in the "switch," the central computer system.

Exhibits 86 and 87 at trial were records for particular Alltel telephone numbers. The telephone number referenced in exhibit 86 belonged to Michael Morris, but Whitlock identified exhibit 86 as being the record for the cellular telephone that he used, explaining that Morris was his father. Exhibit 87 contained subscriber information for a telephone owned by Sarah Ricker, but Ricker testified that she had given the telephone to her daughter's father, Lockett, and the billing address for the telephone was Lockett's brother's house.

Mason testified that the records were made or transmitted by a system with knowledge of the information and were made at or near the time the events appearing in them took place, that it was the regular practice of Alltel to make such a record, that the activity was continuous and for business purposes, and that the records were kept in the regular course of conducted business activity. The defendant objected on the bases of foundation and hearsay, but the objection was overruled and the exhibits were admitted.

### (ii) Cox Communications Records

Christopher Paterson was responsible for the care of records at Cox Communications (Cox) and was responsible for subpoena fulfillment. Paterson testified that for a subscriber to obtain telephone service from Cox, the company would enter the subscriber's name and address into the billing system. A credit check would be performed, and then a technician would go out and install telephone service. The subscriber's information would be permanently stored in the Cox billing system.

Paterson testified that the creation of subscriber information was performed by customer service representatives at the time it was received from the subscriber, was a part of the regular course of Cox's business, and was done continuously by Cox. Cox also kept records of every telephone call, incoming or outgoing, placed by every telephone number. The record was made by the computer system at the time of the telephone call and included the date, time, and length of the call.

When Paterson received a request for subscriber information for a particular number, he would look in the billing system and input the telephone number, and the system would return information on anyone who had ever had that telephone number.

Exhibits 88 through 91 were printouts of such data, returned in response to requests for information from the State. Exhibits 88 and 89 were records of incoming and outgoing telephone calls for Newte's home telephone number on February 24 and 25, 2003. Exhibits 90 and 91 were records for Parisee and the victim's home telephone number for February 24 to 28. The defendant's hearsay and foundation objections were overruled, and the exhibits were received.

### (iii) Cricket Communications Records

Michael Filip was a "switch tech" for Cricket Communications (Cricket), working on the central computer system that interacted with the cellular sites. Filip testified that Cricket keeps records for all active or inactive customers, collecting personal information input into its system by customer representatives, including a customer's name, address, and billing address. The identification code for the telephone and the corresponding telephone number are assigned to that customer. Filip testified that the information was input as it was received from the customer, for identification and billing purposes, in the regular course of business for Cricket.

Filip explained that to connect a call, each time a customer turns on a cellular telephone, the telephone searches for the closest tower that can provide service for that telephone, then it registers with the switch system to establish that the customer is valid and that the telephone is in usable condition. When the customer attempts to make a call, data are kept regarding the call. Filip testified that those records were also made contemporaneously with the events recorded, for business purposes, in the regular course of the business activities of Cricket.

Filip identified exhibits 106 through 113 as Cricket telephone records. In particular, exhibit 108 contained call records for Mayfield's cellular telephone, exhibit 112 contained call records for the telephone that had been found in the victim's vehicle, and exhibit 113 contained call records for a cellular telephone purchased in the names of the defendant and his business. Each call entry in exhibits 112 and 113 showed the billed telephone number, the dialed telephone number, a date and time stamp for the call, the length of the call, and the cellular tower and sector face information (i.e., location data) for the call. The defendant

objected to the exhibits on the basis of hearsay and foundation, and he specifically argued that data contained in exhibits 112 and 113 should be subject to a *Daubert* hearing. The objections were overruled, and the exhibits were received.

Douglas Broer was a field engineer for Cricket, responsible for maintaining and optimizing the network of cellular sites throughout the city. As part of his duties, Broer would drive the entire city, collecting data regarding the network's coverage. Broer explained that in Omaha, Cricket has approximately 60 cellular sites, spread throughout the city based on capacity and coverage needs, all linked back to a central switch. Each cellular site includes three sectors, or directions in which signals flow, generally aimed at 120-degree angles from one another. For instance, a particular cellular tower might have three sectors, one directed north, one directed southeast, and the other directed southwest.

Each sector puts out a constantly generated pilot signal. When a call is generated, the cellular telephone finds the strongest pilot signal and sets up the call on the corresponding sector. The sector serving the geographic area where the telephone is located is most likely the one that will be utilized to set up the call. After the call is established, the telephone can utilize several towers at the same time, but during the call setup phase, it uses only the sector with the strongest signal. Once a traffic channel has been established, the signals go from the cellular site to the switch and are then routed back out either to another telephone, if the call is to another Cricket customer, or to another telephone company's switch, if the call is to a customer of another service provider.

Cricket keeps records of the sector and tower utilized to set up each call. From those, Broer testified that the physical location of the sectors and towers could be determined from the call record database.

Broer admitted on cross-examination that if there was a problem with a particular cellular site, it was possible for a call to be placed through another site farther away. Broer also admitted that since the pilot signal is a radio signal, it was a possibility that a "stray signal" could bounce off a building or something in the atmosphere and end up someplace else, although the signal is generally in the intended location.

### (b) Standard of Review

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006). The admission of hearsay is controlled by the Nebraska Evidence Rules. *Wiekhorst Bros. Excav. & Equip. v. Ludewig*, 247 Neb. 547, 529 N.W.2d 33 (1995).

### (c) Analysis

#### (i) Business Records Exception

The defendant first argues that the trial court erred in concluding that the cellular telephone records entered into evidence met the foundational requirements of the business records exception to the rule against hearsay. Pursuant to Neb. Evid. R. 803(5), Neb. Rev. Stat. § 27-803(5) (Cum. Supp. 2004), the following is not excluded by the hearsay rule:

> A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, other than opinions or diagnoses, made at or near the time of such acts, events, or conditions, in the course of a regularly conducted activity, if it was the regular course of such activity to make such memorandum, report, record, or data compilation at the time of such act, event, or condition, or within a reasonable time thereafter, as shown by the testimony of the custodian or other qualified witness unless the source of information or method or circumstances of preparation indicate lack of trustworthiness.

The party seeking to admit a business record under this exception to the hearsay rule bears the burden of establishing foundation under a three-part test. First, the proponent must establish that the activity recorded is of a type that regularly occurs in the course of the business' day-to-day activities. Second, the proponent must establish that the record was made as part of a regular business practice at or near the time of the event recorded. Third, the proponent must authenticate the record by a custodian or other qualified witness. See, *Misle v. Misle*, 247 Neb. 592, 529

N.W.2d 54 (1995); *State v. Wright*, 231 Neb. 410, 436 N.W.2d 205 (1989).

The defendant claims that contrary to the foundational testimony presented, the telephone records were not actually made in the course of regularly conducted activity, because the documents entered into evidence were not of a type normally sent to customers, but were generated in response to requests from law enforcement. However, the defendant misapprehends the nature of the records at issue. The business records for which foundation was laid were made at the time of the calls they reflect and stored in the regular course of business by the computers of the communications companies of the respective customers. The fact that hard copies of the relevant records were prepared for trial does not change their character.

We considered and rejected an argument effectively identical to the defendant's in what is considered a seminal case on the admissibility of computer records, *Transport Indemnity Co. v. Seib*, 178 Neb. 253, 132 N.W.2d 871 (1965). In that case, decided under the subsequently abrogated Uniform Business Records as Evidence Act, Neb. Rev. Stat. §§ 25-12,108 to 25-12,111 (Reissue 1964) (repealed, 1975 Neb. Laws, L.B. 279, § 75), computer-generated records were used to establish the amount due in an action for insurance premiums. Information on insurance premiums paid was entered into the insurance company's computer, and the computer applied those premiums to the result of calculations performed to determine the amount due, based on what products the consumer had purchased. The data were stored on magnetic tape.

At trial, however, the plaintiff proffered a computer printout showing the premiums the plaintiff alleged were due. The defendant objected on the basis that the printout was prepared for use during litigation and trial, and when that objection was overruled, he raised the issue on appeal. We rejected that argument, concluding that it "exalt[ed] the form over the substance" because, although "[t]he retrieval from the taped record . . . was made for the purposes of the trial . . . the taped record and the information and calculations thereon were made in the usual course of business and for the purpose of the business alone." *Seib*, 178 Neb. at

260, 132 N.W.2d at 875. See, also, *State v. Watson*, 192 Neb. 44, 218 N.W.2d 904 (1974).

Although the Uniform Business Records as Evidence Act has been supplanted by the Nebraska Evidence Rules, rule 803(5) has the same basic foundational requirements for the admission of business records. See *Omaha World-Herald Co. v. Nielsen*, 220 Neb. 294, 369 N.W.2d 631 (1985). See, also, *Richards v. Arthaloney*, 216 Neb. 11, 342 N.W.2d 642 (1983). The reasoning we expressed in *Seib* remains persuasive, and decisions applying Fed. R. Evid. 803(6), upon which Nebraska's rule 803(5) is based, are in substantial accord with that reasoning.

■ Where a Nebraska Evidence Rule is substantially similar to a corresponding federal rule of evidence, Nebraska courts will look to federal decisions interpreting the corresponding federal rule for guidance in construing the Nebraska rule. *State v. Anglemyer*, 269 Neb. 237, 691 N.W.2d 153 (2005). Under Fed. R. Evid. 803(6), a computer printout is admissible as a business record if the offeror establishes a sufficient foundation in the record for its introduction. *U.S. v. Salgado*, 250 F.3d 438 (6th Cir. 2001). See, e.g., *U.S. v. Moore*, 923 F.2d 910 (1st Cir. 1991); *U.S. v. Hernandez*, 913 F.2d 1506 (10th Cir. 1990); *U.S. v. Briscoe*, 896 F.2d 1476 (7th Cir. 1990); *United States v. Miller*, 771 F.2d 1219 (9th Cir. 1985); *United States v. Sanders*, 749 F.2d 195 (5th Cir. 1984). In particular, it has been repeatedly held that telephone calling records such as the exhibits offered in this case, upon foundation comparable to that laid in the instant case, are admissible as business records. See, e.g., *Salgado, supra*; *U.S. v. Chatman*, 994 F.2d 1510 (10th Cir. 1993); *Briscoe, supra*; *Miller, supra*.

■ Most pertinently, under federal rule 803(6), courts have uniformly rejected arguments such as the defendant's and have held that when computer-stored records satisfy the business records exception to the hearsay rule, preparing printouts for evidentiary purposes does not deprive the printouts of their character as business records. See, e.g., *U.S. v. Fujii*, 301 F.3d 535 (7th Cir. 2002); *Hernandez, supra*; *Briscoe, supra*; *Sanders, supra*. We agree and reaffirm our decision in *Transport Indemnity Co. v. Seib*, 178 Neb. 253, 132 N.W.2d 871 (1965), permitting the

admission into evidence of computer-generated records such as those admitted into evidence in this case.

The defendant also argues that "[t]here was no sufficient testimony as to the accuracy and/or trustworthiness of the records." Brief for appellant at 33. We assume, although the defendant's argument is somewhat unclear, that the defendant is referring to the language in rule 803(5) providing that business records are admissible "unless the source of information or method or circumstances of preparation indicate lack of trustworthiness." However, the defendant misunderstands the foundational requirements of the business records exception.

The reason for excluding business records from the hearsay rule is their circumstantial guarantees of trustworthiness. *United States v. Pfeiffer*, 539 F.2d 668 (8th Cir. 1976). The business records exception " 'contemplates that certain events are regularly recorded as "routine reflections of the day to day operations of a business" so that "the character of the records and their earmarks of reliability" import trustworthiness. Thus, the recordation becomes a reliable recitation of the fact.' " *Higgins v. Loup River Public Power Dist.*, 159 Neb. 549, 557-58, 68 N.W.2d 170, 176 (1955) (discussing Uniform Business Records as Evidence Act). See, *Palmer v. Hoffman*, 318 U.S. 109, 63 S. Ct. 477, 87 L. Ed. 645 (1943); *U.S. v. Briscoe*, 896 F.2d 1476 (7th Cir. 1990). Cf. *State v. Spaulding*, 211 Neb. 575, 319 N.W.2d 449 (1982) (discussing trustworthiness of business records under Confrontation Clause). It is the circumstances under which the records are recorded, kept, maintained, and used that give the reliability essential to the law's conclusion that without any independent recollections by those who made the succession of entries they are reliable, precisely because the business relies on them for important business judgments. *United States v. Blake*, 488 F.2d 101 (5th Cir. 1973).

In other words, the defendant is incorrect in suggesting that there was no testimony as to the trustworthiness of the records, because "the ordinary business circumstances described suggest trustworthiness . . . at least where absolutely nothing in the record in any way implies the lack thereof." (Citation omitted.) *U.S. v. Moore*, 923 F.2d 910, 915 (1st Cir. 1991). See *Chalupa v. Hartford Fire Ins. Co.*, 217 Neb. 662, 665, 350 N.W.2d 541,

544 (1984) (testimony of business circumstances is sufficient foundation under rule 803(5), unless " 'the source of information or method or circumstances of preparation indicate lack of trustworthiness' "). The defendant had the opportunity to cross-examine each of the communications company witnesses regarding the process by which the records were created and maintained, yet there is nothing in the record to suggest that the exhibits presented in this case were not trustworthy, as such records are presumed to be when sufficient foundation for the business records exception is laid.

The defendant also appears to argue that even if the business records exception was satisfied, the exhibits should have been excluded as irrelevant and unduly prejudicial, because cellular site location data was used, according to the defendant, to place him at the scene of the crime. However, exhibits 112 and 113, which were the only records to contain such location data, were objected to by the defendant only on the bases of foundation, hearsay, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). On appeal, a party may not assert a different ground for an objection to the admission of evidence than was offered to the trial court. *State v. Shipps*, 265 Neb. 342, 656 N.W.2d 622 (2003). An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006). To the extent that the defendant's claims with respect to cellular site location data are not subsumed in his *Daubert* argument, we decline to consider them, in the absence of an objection at trial.

For the foregoing reasons, we reject the defendant's argument that the trial court erred in finding that the cellular telephone records offered by the State fell within the business records exception to the hearsay rule.

*(ii)* Daubert *Requirements for Cellular Location Data*

The defendant argues that the cellular location data, contained in exhibits 112 and 113 and explained by Filip and Broer, should not have been admitted without a *Daubert* inquiry. An expert's opinion is ordinarily admissible under Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1995), if the

witness (1) qualifies as an expert, (2) has an opinion that will assist the trier of fact, (3) states his or her opinion, and (4) is prepared to disclose the basis of that opinion on cross-examination. *State v. Mason*, 271 Neb. 16, 709 N.W.2d 638 (2006). When the opinion involves scientific or specialized knowledge, this court held in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), that we will apply the principles of *Daubert, supra*. See *Mason, supra*. Under our recent *Daubert/Schafersman* jurisprudence, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. This gatekeeping function entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Mason, supra*.

The principles articulated in *Daubert* and adopted by this court in *Schafersman* were based on Fed. R. Evid. 702, which was, at the time of *Daubert*, effectively identical to Nebraska's rule 702. Both rules provide that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." But *Daubert* does not create a special analysis for answering questions about the admissibility of all expert testimony. *City of Lincoln v. Realty Trust Group*, 270 Neb. 587, 705 N.W.2d 432 (2005). Not every attack on expert testimony amounts to a *Daubert* claim. *City of Lincoln, supra*. Here, the defendant's purported *Daubert* claim is suspect because the defendant's *Daubert* objection was made, not to expert opinion testimony, but to business records evidencing historical facts. Moreover, even if the objection is extended to the testimony based upon those records, the testimony given was not expert opinion testimony.

If a witness is not offering opinion testimony, that witness' testimony is not subject to inquiry pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). See, *Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277 (10th Cir. 2000); *Binakonsky v. Ford Motor Co.*, 133 F.3d 281 (4th Cir. 1998); *Gilbert v. Monaco*

*Coach Corp.*, 352 F. Supp. 2d 1336 (N.D. Ga. 2004). Cf. *Sedlak Aerial Spray v. Miller*, 251 Neb. 45, 555 N.W.2d 32 (1996) (permitting "expert witness" to testify to personal knowledge). *Daubert* is inapplicable under such circumstances because it pertains to the validity of the reasoning or methodology underlying an expert's opinion. See, *Binakonsky, supra*; *Gilbert, supra*. As the *Gilbert* court explained:

> In the paradigm *Daubert* situation, a party seeks to use an expert witness to opine regarding causation in a matter where a lay finder of fact would be unable to discern the cause of a particular event, absent some guidance by someone with more knowledge or experience than the layperson. In such cases, the expert is allowed to offer an opinion because the Court determines that the finder of fact would be otherwise unable to reach a conclusion merely through an assessment of the credibility of witnesses or through the operation of the finder's own inductive abilities. The operative task for the typical expert witness, then, is the presentation of an opinion, along with an explanation of the methodology that led to the formation of the particular opinion.

352 F. Supp. 2d at 1340. Obviously, while that is a common example, not all expert opinions relate to causation. But regardless of the issue to which an expert opinion might be relevant, the fact remains that if no expert opinion is tendered, there is no basis for a *Daubert* inquiry.

With that understood, it is evident that *Daubert* is not pertinent to exhibits 112 and 113. Those records contained nothing even resembling "expert opinion testimony," since they did not refer to an expert, an opinion, or any testimony. They were, as previously detailed, computer-generated business records containing data of telephone calls made to and from the defendant's and the victim's cellular telephones. Any challenge to the reliability of those records, or the trustworthiness of the data they contained, would properly have been framed under rule 803(5), not rule 702 and *Daubert*. As explained above, however, the defendant failed to effectively make such a challenge.

Even if the defendant's objections and argument are construed to address Broer's testimony relating to exhibits 112 and

113, *Daubert* remains inapplicable. Since Broer's testimony was based on his personal experience with the data and locations at issue, there is, initially, some question as to whether Broer testified as an expert under rule 702, as opposed to offering testimony based on personal knowledge pursuant to Neb. Evid. R. 602, Neb. Rev. Stat. § 27-602 (Reissue 1995). See *Gordon v. State*, 863 So. 2d 1215 (Fla. 2003) (testimony of telephone company employee and police detective, regarding cellular telephone records and location of cellular sites, was not expert testimony, but based on personal knowledge).

But even if Broer's testimony was based on "scientific, technical, or other specialized knowledge," there is little doubt that it assisted the trier of fact to understand the evidence and that Broer would have been qualified as an expert. See rule 702. Regardless, Broer's testimony was limited to explaining the data contained in exhibits 112 and 113, and he did not offer any opinions based on that data. Compare *Pullin v. State*, 272 Ga. 747, 534 S.E.2d 69 (2000) (inquiry into scientific theory required where expert opined, based on cellular telephone location data, that particular telephone calls could not have been made from location asserted by defendant). Since Broer offered no expert opinion, his testimony presented no basis for an inquiry into his reasoning or methodology pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). To the extent that the defendant wanted to raise more general questions about the reliability of the records and the cellular location data, Broer was available for cross-examination on those issues.

The trial court did not err in refusing to hold a *Daubert* hearing with respect to exhibits 112 and 113, and we have already rejected the defendant's argument under the business records exception. Therefore, the defendant's second assignment of error is without merit.

### 3. DEFENDANT'S NEPHEW'S COAT

#### (a) Background

At the scene of the defendant's arrest, Larry Cahill, of the Omaha police homicide unit, obtained a fur-lined leather coat from Damar Haywood, the defendant's nephew, who was the

person arrested and detained along with the defendant. At trial, outside the presence of the jury, the State indicated its intent to offer the coat into evidence. The defendant objected that the coat was not relevant, because Haywood had not been charged in the crime and there had been no suggestion that the defendant wore the coat or that it even fit him. The State argued that because of the testimony that the perpetrators wore dark, fur-lined hooded coats, it was relevant that such a coat was found in the possession of the person accompanying the defendant when he was arrested, within 2 hours after the killing. The court reserved ruling until the coat was offered at trial.

At trial, Cahill testified that he had been assigned to interview Haywood following the arrest. Cahill said that the first thing he noticed on Haywood was that he was wearing a coat similar to that described by witnesses at the scene. The defendant's relevance objection to that testimony was overruled. Cahill said he seized the coat from Haywood. Cahill identified the coat at trial, and it was admitted into evidence over the defendant's relevance objection.

(b) Standard of Review

■■ The exercise of judicial discretion is implicit in determinations of relevancy under Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995), and prejudice under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995), and a trial court's decision regarding them will not be reversed absent an abuse of discretion. *State v. Iromuanya, ante* p. 178, 719 N.W.2d 263 (2006).

(c) Analysis

The defendant argues that the coat found with the defendant's nephew was not relevant or, alternatively, that if relevant, the probative value of the coat was outweighed by undue prejudice to the defendant. The defendant claims that the coat was irrelevant and unduly prejudicial because there was no evidence that the defendant "ever wore or could fit into that coat." Brief for appellant at 35.

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than

it would be without the evidence. Rule 401. The coat at issue was relevant because witnesses to the killing, which occurred approximately 2 hours before the defendant's arrest, described similar garments being worn by the killer and his companions. Because similar garments were described at the scene of the crime, finding the coat in the proximity of the defendant a short while later made it more probable that the defendant or his companion was one of the men seen wearing such a garment at the scene of the crime.

The fact that no testimony directly established that the coat belonged to the defendant does not diminish its relevance. Had the coat been found in the closet at the defendant's business, instead of with his nephew, the evidence connecting the coat to the defendant would be no more direct. The jury was entitled to infer, from the proximity of the garment to the defendant, that it was possible for the defendant to have worn the coat at the scene of the killing. The jury was equally entitled to infer that even if the coat actually belonged to the defendant's nephew, the reason the killer's companions at the scene of the crime were dressed similarly to the defendant's companion when he was arrested was that the killer and the defendant were one and the same person. Either way, the fact that the coat was at the defendant's business made the defendant's presence at the crime scene more probable than it would have been without the evidence. The trial court did not abuse its discretion by concluding that the evidence was relevant.

For similar reasons, we conclude that the trial court did not abuse its discretion in overruling the defendant's objection pursuant to rule 403. We note that there is no rule 403 objection in the record. But even if we apply rule 403, the defendant's argument is without merit. As pertinent, rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." The fact that evidence is prejudicial is not enough to require exclusion under rule 403, because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence which has a tendency to suggest a decision on an improper basis that is unfairly prejudicial under § 27-403.

*State v. Miner*, 265 Neb. 778, 659 N.W.2d 331 (2003). Here, while the admission of the coat into evidence may have been prejudicial to the defendant, it was not unfairly so, because it did not suggest a decision on an improper basis.

The trial court did not abuse its discretion by admitting the coat into evidence, so we reject the defendant's third assignment of error.

### 4. Sufficiency of Evidence

At trial, the defendant, relying primarily on inconsistencies among the statements and testimony of the State's witnesses, argued that there was a reasonable doubt as to whether the defendant had been the victim's killer. Those inconsistencies, and other facts relating to the credibility of the State's witnesses, are summarized below.

### (a) Background

When Daylan was interviewed by police after the shooting, he did not tell them about going with the victim to a house on Florence Boulevard, because he "didn't think it was nothing." Only when he was interviewed for the third time, on July 22, 2003, did he mention that he had gone with the victim to the defendant's residence. Daylan had previously been convicted of giving false information on more than one occasion.

When interviewed by police on the night of the killing, Mayfield said that she had not seen the shooting. Instead, Mayfield told police that the white sport utility vehicle pulled up at the ordering station and that when the occupants were informed that the restaurant was closed, the vehicle continued around the building and Mayfield did not see it again. When contacted again on February 25 and 27, 2003, Mayfield again denied witnessing the shooting. But after viewing a videotape from Popeyes, Mayfield told police that she had actually seen the shooting. Mayfield admitted to lying to police, stating that she was "fibbing then" because she "didn't even want to be involved." Mayfield did not mention anything to police about the telephone call from Lockett identifying "Fast Eddie" as the killer until the February 27 interview, and even then did not identify Lockett as the caller. Only on July 22, when specifically

confronted on that issue by police, did Mayfield admit that Lockett had told her that "Fast Eddie" committed the crime.

Whitlock admitted that he had two previous convictions for giving false information. Whitlock did not remember whether or not he had, when interviewed at the crime scene, mentioned the defendant's telephone calls to him. However, he admitted that he "probably didn't mention it." Kozelichki testified that Whitlock had not informed police of the telephone calls. Whitlock first told police about the telephone calls in an interview conducted on March 30, 2003. At that time, Whitlock only told police about two telephone calls and said to police that he did not think he could testify about the matter. But after that interview, Whitlock was indicted in federal court for conspiracy to distribute crack cocaine. At the time of trial, Whitlock was in federal custody stemming from his 2004 conviction on that charge. Whitlock admitted that although he did not have a "deal or any specific agreement with any agency," he hoped that his willingness to testify in this proceeding might benefit him. When asked if he hoped "the fact that you have testified would be relayed to the U.S. Attorney in order to attempt to get a downward departure," Whitlock replied, "I wouldn't mind, but I doubt it."

Lockett admitted that he had three convictions for providing false information to the police and two other felony convictions in the 10 years prior to trial. At the time he testified, Lockett was serving his sentence on his second felony conviction on a federal charge. Lockett did not have an agreement with the State regarding his testimony or any guarantee that he would receive a reduced sentence if he testified. Lockett admitted that "[a]t first," he had hoped that he might get some kind of reduction if the U.S. Attorney filed a motion for a downward departure, but realized that even if the U.S. Attorney filed such a motion, a federal judge would determine if a reduction would be granted. Lockett also admitted that he had provided information to the police regarding the alleged murder of Lockett's brother by Danny Ray Robinson, another nephew of the defendant. See *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

Lockett did not, immediately after the killing, tell police about the events to which he testified at trial. Lockett claimed that he did not contact police because he was on federal pretrial release

at the time and was not supposed to have contacts with law enforcement. Lockett admitted that he was located by law enforcement and interviewed on February 26, 2003, at which time he admitted driving past Popeyes and seeing the victim "in a beef," but did not report seeing anything else. Lockett admitted that he came forward after he was contacted in July by his lawyer, who told Lockett and Clark that police wanted to talk to Lockett about a homicide involving the victim and the defendant. Only then did Lockett tell his lawyer that he had seen the defendant shoot the victim. At trial, Lockett was cross-examined with respect to factual inconsistencies between his trial testimony and the telephone call he made to his lawyer, which was recorded and transcribed because Lockett was in federal custody.

After the conversation between Lockett and his lawyer, police came to interview Lockett on July 31, 2003. Lockett was, at that point, awaiting sentencing on his federal conviction. Lockett made a statement to police and was cross-examined extensively about inconsistencies between his July 31 statement to police and his trial testimony. For instance, Lockett told police that he observed events from the driveway of a house near the drive-in, not from the parking lot of the drive-in itself. In his statement, Lockett indicated that Robinson left the scene of the crime in the black van, not the white sport utility vehicle. Lockett was also cross-examined with respect to various inconsistencies in his descriptions of the clothing that the victim, the killer, and the killer's companions were wearing.

Defense counsel took Lockett's deposition on June 29, 2004. The deposition was the first time that Lockett stated that he observed the killing from the drive-in parking lot. Lockett was again cross-examined with respect to inconsistencies in his accounts of what the participants in the killing were wearing.

Lockett denied speaking with Clark about the details of the events of February 24, 2003, between the time of his interview with police and the taking of his deposition. However, telephone calls between Lockett and Clark, recorded because Lockett was in federal prison, indicated that the two had discussed the events of February 24.

Clark did not speak with police about the killing until July 26, 2003. When she spoke to Lockett's lawyer, and to police on

July 26, she said that she was on the corner of 30th and Fort Streets when she saw the shooting take place. Clark admitted that she is nearsighted and was not wearing her glasses on February 24. Clark was also cross-examined with respect to other inconsistencies between her statement to police and her trial testimony. Most pertinently, it was not until she was taken back to the scene by police, on August 1—after a visit with Lockett—that she told the police that she and Lockett had witnessed events from the drive-in parking lot. Clark also admitted that prior to her testimony, the county attorney had canceled some warrants for Clark and had permitted Clark and her child to meet with Lockett, who is the child's father.

### (b) Standard of Review

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Gunther*, 271 Neb. 874, 716 N.W.2d 691 (2006). In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *Id.*

### (c) Analysis

The defendant argues, first, that the evidence is insufficient to sustain a conviction on any charge. The defendant contends that the State's witnesses, particularly Lockett, are not credible. Since Lockett was the only witness to identify the defendant as the killer, the defendant contends no credible witness can place him at the scene of the crime.

But all of the arguments that the defendant makes on appeal against Lockett's credibility are the product of extensive cross-examination at trial, and the defendant's closing argument attacked Lockett's credibility in the same way. The credibility and weight of witness testimony are for the jury to determine, and

witness credibility is not to be reassessed on appellate review. See *State v. Faust*, 269 Neb. 749, 696 N.W.2d 420 (2005). In determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within the jury's province for disposition. *State v. Leonor*, 263 Neb. 86, 638 N.W.2d 798 (2002). The defendant may disagree with the jury's evaluation of the credibility of the State's witnesses, but this court will not revisit the jury's conclusions.

The defendant also argues that even if there is enough evidence to support a conclusion that the defendant was the killer, the evidence does not substantiate a conviction for first degree murder. The elements of first degree murder are listed in Neb. Rev. Stat. § 28-303 (Cum. Supp. 2004), which states that a person commits murder in the first degree if he or she kills another person purposely and with deliberate and premeditated malice. The defendant argues the evidence does not support a finding that the killing was done with deliberate and premeditated malice.

Deliberate means not suddenly, not rashly, and requires that the defendant considered the probable consequences of his or her act before doing the act. *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002). The term "premeditated" means to have formed a design to commit an act before it is done. *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001). One kills with premeditated malice if, before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification. *Harms, supra*. No particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death. *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998). The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed. *Harms, supra*. A question of premeditation is for the jury to decide. *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995).

Given the foregoing propositions, it is apparent that the evidence, viewed in the light most favorable to the State, is sufficient to support the jury's finding that the defendant killed the victim with deliberate and premeditated malice. To begin with, Whitlock testified that in a telephone call prior to the killing, the defendant said that he did not want to have to "pop" the victim. This statement could easily be interpreted as a reference to killing the victim and, while not conclusive, supports an inference that the defendant was contemplating the possibility of killing the victim well before their actual confrontation. Whitlock's testimony also indicates that the defendant was angry with the victim and had been searching for the victim, suggesting both a motive and a deliberate intent to confront the victim and perhaps to kill him. While the witnesses generally testified that one of the killer's companions handed him the gun used in the shooting, the jury could reasonably infer that the killer was not surprised to be provided with a weapon, either because the killing was planned or because the killer asked for the gun. Lockett testified that the defendant shot the victim and continued to fire, even when the victim had retreated to his car, which also supports a finding of deliberate and premeditated malice.

In short, when the record is viewed in the light most favorable to the State, there is sufficient evidence to support the conclusions that the defendant killed the victim and that he committed the killing with deliberate and premeditated malice. The defendant's challenge to the sufficiency of the evidence is without merit.

### 5. MISCONDUCT IN OPENING AND CLOSING ARGUMENT

#### (a) Standard of Review

 Whether prosecutorial misconduct is prejudicial depends largely on the facts of each case. *State v. Faust*, 269 Neb. 749, 696 N.W.2d 420 (2005). An appellate court reviews a motion for new trial on the basis of prosecutorial misconduct for an abuse of discretion of the trial court. *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999).

#### (b) Analysis

The defendant takes issue with several aspects of the State's opening and closing arguments, particularly the closing argument. The defendant claims that the State misused cellular site

location data because "[t]he State repeatedly in their [sic] closing argument said the phone records are unimpeachable third party independent evidence and they are telling you people's exact location and time." Brief for appellant at 47. The defendant claims the State committed misconduct in referring to a telephone call received on the defendant's telephone from an employee of the defendant's business, because the State implied that the employee was at the defendant's business at the time he made the call but did not prove that fact. The defendant also claims that the State misstated the record in impeaching Blake's testimony that the killer drove a Cadillac Escalade by noting that Blake misidentified the victim's Chevrolet Impala as a Chevrolet Caprice. But the defendant did not object to any of these arguments.

In order to preserve, as a ground of appeal, an opponent's misconduct during closing argument, the aggrieved party must have objected to improper remarks no later than at the conclusion of the argument. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998). Any objection to a prosecutor's arguments made after the jury has been instructed and has retired is untimely and will not be reviewed on appeal. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000). Absent plain error, an issue not raised to the trial court will not be considered by the Nebraska Supreme Court on appeal. *State v. Bao*, 269 Neb. 127, 690 N.W.2d 618 (2005). Furthermore, when a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial. *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006). One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *Id.* A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct. *Id.* We have carefully reviewed the record and find no plain error.

The defendant also takes issue with the State's discussion of whether the defendant's GMC Yukon Denali was customized. The State implied that the Yukon Denali was misidentified by eyewitnesses because it had features not present

on an ordinary Yukon Denali, but there was no evidence to that effect. The defendant objected to the argument concerning the customizing of the defendant's vehicle, but when those objections were sustained, the defendant did not make a motion for a mistrial. It is a well-established legal principle that it is improper for counsel to comment during closing argument on matters unsupported by the evidence. *State v. Russell*, 248 Neb. 723, 539 N.W.2d 8 (1995). But, as previously noted, it is equally well established that a party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct. *Robinson, supra.* No such motion was made here. In any event, before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred. *State v. Beeder*, 270 Neb. 799, 707 N.W.2d 790 (2006). While the State went beyond the facts in evidence when its argument implied that the defendant's GMC Yukon Denali had different features from the stock features of such a vehicle, we cannot conclude that a miscarriage of justice occurred as a result of the State's objectionable references to the customization of the defendant's vehicle.

The defendant also contends that the State's argument misstated the law with respect to the jury instructions on lesser-included offenses. The State noted that although a step instruction had been given, instructing the jury on lesser-included offenses of first degree murder, the State's position was that the defendant was guilty of first degree murder. As we understand the defendant's claim, he is characterizing the State's argument as implying that the lesser-included offense instructions were merely technicalities, not supported by the evidence. But again, the defendant did not object to the State's argument.

A court must instruct on a lesser-included offense if (1) the elements of the lesser offense are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense. *State v. Weaver*, 267 Neb. 826, 677 N.W.2d 502 (2004). Step instructions which require

consideration of the most serious crime charged before consideration of lesser-included offenses are not erroneous. *State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999).

We have reviewed the State's closing statement, and we disagree with the defendant's contention that the State misstated the law. The State's argument, in fact, correctly explained the operation of the step instruction. The conduct of a prosecutor which does not mislead and unduly influence the jury and thereby prejudice the rights of the defendant does not constitute misconduct. *State v. Faust*, 269 Neb. 749, 696 N.W.2d 420 (2005). The State did not act improperly, or mislead the jury, by stating that although the jury had been instructed on lesser-included offenses, the State's consistent position was that the defendant committed first degree murder. In the absence of an objection or motion for mistrial, we find no plain error in this argument.

For the foregoing reasons, we reject the defendant's claim of prosecutorial misconduct. ·

### 6. Finding of Habitual Criminal

#### (a) Background

Exhibits 137 through 139 evidenced the defendant's conviction, pursuant to a plea agreement, of a federal charge of distribution of a controlled substance. Exhibit 137, a certified copy of the plea agreement, indicated the defendant's willingness to plead guilty to conspiring to distribute and to possess with intent to distribute cocaine, exposing him, among other punishments, to imprisonment of 10 years to life and a fine of not more than $4 million. Over several pages, the agreement explained the rights and obligations of the parties. The agreement was executed on June 28, 1993, by "[t]he United States of America, by and through the United States Attorney for the District of Nebraska, and the Defendant, by and through his attorney . . . ." The document was signed by the defendant, the defendant's attorney, and an assistant U.S. Attorney.

Exhibit 138 is a certified and file-stamped copy of the defendant's petition to enter a plea of guilty, filed in the U.S. District Court on June 28, 1993. In the petition, the defendant identified his counsel by name and indicated that he had had enough time to talk with counsel, had told counsel everything about his

case, and was satisfied with the job counsel had done for him. The defendant indicated that he understood the charges against him, expressly stated his understanding of several constitutional rights that he was waiving by pleading guilty, and indicated his understanding of several specific aspects of the sentencing process. The defendant indicated the voluntary nature of his plea. The defendant also indicated that his attorney had reviewed all of the questions in the petition and the defendant's answers to them. The petition was signed by the defendant in the presence of his attorney.

The petition is accompanied by a certificate of defense counsel, signed by the defendant's attorney in the presence of the defendant, in which the defendant's attorney indicated that he had read and fully explained to the defendant the allegations against him; that the plea of guilty offered by the defendant accorded with the attorney's understanding of the facts related to him, was consistent with the attorney's advice to the defendant, and was, in the attorney's opinion, voluntarily and understandingly made; and that the attorney had advised the defendant about the sentencing procedures and explained the potential consequences of the plea.

Exhibit 139 is a certified and file-stamped copy of the U.S. District Court's judgment and commitment order, entered February 8, 1994. The order stated that the defendant "appeared in person with counsel" and "has pleaded guilty to Count I of the Indictment." The defendant was adjudged guilty of conspiracy to distribute and to possess with intent to distribute cocaine, a controlled substance, and was sentenced to a term of 68 months' imprisonment, to be followed by a term of 5 years' supervised release.

### (b) Standard of Review

A trial court's determination of the admissibility of physical evidence will not ordinarily be overturned except for an abuse of discretion. *State v. Hall*, 270 Neb. 669, 708 N.W.2d 209 (2005), *cert. denied* 547 U.S. 1134, 126 S. Ct. 2028, 164 L. Ed. 2d 790 (2006).

### (c) Analysis

Neb. Rev. Stat. § 29-2221(1) (Reissue 1995) provides, in relevant part, that

[w]hoever has been twice convicted of a crime, sentenced, and committed to prison, in this or any other state or by the United States or once in this state and once at least in any other state or by the United States, for terms of not less than one year each shall, upon conviction of a felony committed in this state, be deemed to be a habitual criminal and shall be punished by imprisonment in a Department of Correctional Services adult correctional facility for a mandatory minimum term of ten years and a maximum term of not more than sixty years . . . .

In a habitual criminal proceeding, the State's evidence must establish with requisite trustworthiness, based upon a preponderance of the evidence, that (1) the defendant has been twice convicted of a crime, for which he or she was sentenced and committed to prison for not less than 1 year; (2) the trial court rendered a judgment of conviction for each crime; and (3) at the time of the prior conviction and sentencing, the defendant was represented by counsel or had knowingly and voluntarily waived representation for those proceedings. See *Hall, supra*. The existence of a prior conviction and the identity of the accused as the person convicted may be shown by any competent evidence, including the oral testimony of the accused and duly authenticated records maintained by the courts or penal and custodial authorities. *Id.* Specifically, in a proceeding for an enhanced penalty, the State has the burden to show that the records of a defendant's prior felony convictions, based on pleas of guilty, affirmatively demonstrate that the defendant was represented by counsel or that the defendant, having been informed of the right to counsel, voluntarily, intelligently, and knowingly waived that right. *State v. King*, 269 Neb. 326, 693 N.W.2d 250 (2005).

The defendant argues that exhibits 137 through 140, evidencing the defendant's conviction, pursuant to a plea agreement, of a federal charge of distribution of a controlled substance, were objectionable because "none of the documents offered actually showed that the defendant appeared before a Judge with counsel and entered his plea." Brief for appellant at 48. The defendant compares this case to *State v. Hall*, 268 Neb. 91, 679 N.W.2d 760 (2004), in which we found it insufficient that the record of a defendant's prior conviction showed that he had been represented

by counsel at sentencing, but did not show that he had been represented by counsel or waived counsel prior to sentencing. See, also, *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002).

The defendant's argument is without merit. Exhibit 137, the defendant's plea agreement, was signed by the defendant's attorney. In exhibit 138, the defendant's petition to enter a plea of guilty, both the defendant and his attorney indicated repeatedly that the defendant was counseled with respect to the plea. And prior to convicting and sentencing the defendant, the federal district court indicated in exhibit 139, its sentencing order, that the defendant appeared in person with counsel and pleaded guilty. These exhibits were admissible and clearly sufficient to support the trial court's finding that the defendant was a habitual criminal.

## 7. REMOVAL OF JURORS

### (a) Standard of Review

■ The retention or rejection of a juror is a matter of discretion for the trial court. *State v. Harrison*, 264 Neb. 727, 651 N.W.2d 571 (2002). This rule applies both to the issue of whether a venireperson should be removed for cause and to the situation involving the retention of a juror after the commencement of trial. *State v. Krutilek*, 254 Neb. 11, 573 N.W.2d 771 (1998).

### (b) Juror No. 3

#### (i) Background

During voir dire, juror No. 3 reported that she knew a "Parisee" who attended her church. Juror No. 3 reported that she did not know Parisee's last name or really know her. After lunch on the second day of trial, the defendant's counsel brought it to the attention of the court that when the jury was out on recess, "it appeared that maybe [juror No. 3] had some acknowledgement with Parisee Fant, who has previously testified." Juror No. 3 explained, "I just tried — I try not to look, keep straight ahead. I don't know if she spoke or not. I was trying not to look at her at all. And it's hard, it's hard every time I have to go out." Counsel for the defendant clarified, for the record, that juror No. 3 indicated that Parisee waved at juror No. 3 and that juror No. 3 waved back, but that "was the end of it." The defendant made no request that juror No. 3 be removed from the jury at that time.

Another short recess was taken that afternoon. After the recess, juror No. 3 complained to the court that she felt very uncomfortable because of the situation with Parisee and wanted to be removed from the jury. When asked if she had discussed the issue with any of the other jurors, juror No. 3 replied that she had mentioned that she might ask to be removed. When asked if she had discussed the reason for that request, juror No. 3 said that the jury already knew the reason, from the questioning that had occurred during voir dire. Juror No. 3 identified the fellow juror to whom she had spoken about possibly asking to be removed, although there were other jurors in the jury room at the time.

The court excused juror No. 3 from the jury, and she was replaced with an alternate. The court informed the jury that juror No. 3 had been excused and instructed the remaining jurors not to speculate or concern themselves with her absence. The defendant did not make any objection or motion based upon juror No. 3's removal.

### (ii) Analysis

The defendant assigns that the trial court "erred in not immediately removing . . . a juror who had contact with the victim's wife." However, the defendant's brief does not actually advance that argument. Instead, the defendant argues that the court erred in not asking the other jurors about any conversations they may have been a part of with juror No. 3. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. State v. Vasquez, 271 Neb. 906, 716 N.W.2d 443 (2006). Here, the defendant's assignment of error and the argument in his brief, while both dealing with juror No. 3, raise completely different legal issues.

Furthermore, the defendant's brief asserts that after juror No. 3 indicated that she did not want to remain on the jury, "[t]he Defendant's counsel did ask that the Court inquire of the other jurors to see if anything [juror No. 3] said would affect their ability to continue; this was denied by the Court." Brief for appellant at 50. This assertion is unsupported by the record. Neither the section of the record specifically cited by the defendant for this assertion nor any other part of the voluminous record

before this court contains any such request by any party. It is incumbent upon an appellant to supply a record which supports his or her appeal. *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002). In the absence of plain error, when an issue is raised for the first time in an appellate court, the issue will be disregarded inasmuch as the trial court cannot commit error regarding an issue never presented and submitted for disposition in the trial court. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006).

The trial court did not remove juror No. 3 from the jury until she said that it would be difficult for her to continue, and the record does not suggest that any conversation that juror No. 3 may have had with other jurors about the matter would have been prejudicial to the defendant. In other words, the record does not suggest misconduct on the part of juror No. 3, much less prejudicial misconduct. In a criminal case, jury misconduct must be demonstrated by clear and convincing evidence. *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002). Where the jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming the misconduct. *Id.* The trial court carefully exercised its discretion on this matter, and no abuse of that discretion, or plain error, is evidenced by the record.

### (c) Juror No. 22

#### (i) Background

On the morning of Thursday, October 7, 2004, the third day of trial, the court and counsel addressed a situation involving juror No. 22, who appeared to have been sleeping during Tuesday's proceedings. The State suggested a general admonishment to the jury to be vigilant and attentive. The defendant asked that juror No. 22 be removed from the jury. The Court decided to perform a general admonishment, as suggested by the State, and "continue to attempt to monitor the situation."

After the midday recess on October 7, 2004, the court noted, outside the presence of the jury, that juror No. 22 had again been sleeping during Whitlock's testimony. The court also noted that "the juror seated next to him was making eye contact with me and motioning towards him while this was going on." The court, while acknowledging that removal of juror No. 22 would commit the

last alternate juror, determined that juror No. 22 would be removed from the jury. The defendant did not object to the removal or make a motion for mistrial as a result of either the removal of juror No. 22 or the failure to remove juror No. 22 earlier.

### (ii) Analysis

The defendant's appellate argument is that the trial court erred in not removing juror No. 22 from the jury on the morning of October 7, 2004, instead of after lunch. The defendant argues that juror No. 22's conduct could have been a distraction to the other jurors.

However, as previously noted, where jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming the misconduct. *Thomas, supra.* The record here does not suggest that the defendant was prejudiced. Nor did the defendant make a timely motion for mistrial based upon any perceived distraction. When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial. One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *State v. Iromuanya, ante* p. 178, 719 N.W.2d 263 (2006).

The trial court in this case, faced with placing its final alternate juror on the panel in an early stage of a long and complicated proceeding, appropriately exercised its discretion in deciding whether and when to remove juror No. 22 from the jury. And, as previously discussed, the trial court did not err in the exercise of its discretion with respect to the removal of juror No. 3. Consequently, we find the defendant's final assignment of error to be without merit.

### V. CONCLUSION

For each of the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

HENDRY, C.J., not participating.