George R. FUSNER, Jr., as Designated Representative of the Mexican Consulate

v.

COOP CONSTRUCTION
CO., LLC, et al.

Supreme Court of Tennessee,
at Nashville.

Oct. 4, 2006 Session.

Jan. 18, 2007.

Christian M. Garstin and Michael J. Vetter, Nashville, Tennessee, for the appellants, Coop Construction Co., LLC and Hartford Casualty Insurance Company.

George R. Fusner, Jr., Brentwood, Tennessee, as the designated representative for the appellee, the Mexican Consulate.

## OPINION

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER, GARY R. WADE, JJ., and ADOLPHO A. BIRCH, JR., Sp.J., joined.

We granted review of this workers' compensation case to clarify whether nonresident foreign nationals can qualify as "dependents" under Tennessee Code An-

notated section 50–6–210 and receive benefits due upon an employee's death. We accepted review before the case was heard or considered by a Special Workers' Compensation Appeals Panel. We hold that non-resident foreign nationals can be "dependents" under our workers' compensation laws. In this case, we affirm the trial court's judgment that the decedent employee's parents were "dependents," but we reverse the trial court's finding that they were "actual dependents" under the statute. We remand the case for further proceedings consistent with this opinion, including for a determination of the benefit due to the parents as "partial dependents" under Tennessee Code Annotated section 50–6–210(d).

### FACTS AND PROCEDURAL HISTORY

On October 3, 2002, while employed at a Nashville construction site by appellant Coop Construction Co., LLC ("Employer"),[1] Jaime Humberto Diaz Pedraza ("Employee"), a Mexican national, fell to his death. Employee's parents, Juana Martinez Pedraza ("Ms. Pedraza") and Albino Baez Diaz ("Mr. Diaz"), residents and citizens of Zempoala, State of Veracruz, Mexico, sought United States legal assistance to secure any workers' compensation benefits due to their son's estate or to them. Pursuant to Tennessee Code Anno-

tated section 50–6–227 (1999), the Mexican Consulate in Atlanta ("the Consulate") appointed attorney George R. Fusner, Jr., as its representative to prosecute claims on Employee's parents' behalf.

In September 2003, the Consulate filed a complaint in Davidson County Circuit Court seeking to recover any benefits due to Ms. Pedraza and Mr. Diaz under Tennessee Code Annotated section 50–6–210 (1999). Employer answered, and discovery ensued.[2] The discovery process was complicated significantly because the parents live in Mexico and do not speak English.

Ms. Pedraza and Mr. Diaz flew from their home in Mexico to a law office in McAllen, Texas, where the parties deposed them on November 16, 2004. In her videotaped deposition,[3] Ms. Pedraza described herself as a sixty-five-year-old homemaker barely literate in Spanish and wholly unfamiliar with English. She testified that from December 1999 until his death Employee sent Mr. Diaz and her money on a monthly basis to cover the family's expenses. In his videotaped deposition, Mr. Diaz described himself as a seventy-four-year-old laborer illiterate in both Spanish and English. Corroborating Ms. Pedraza's testimony, he stated that from late 1999 until the month before Employee's death, Employee wired money

---

1. Also named as a defendant in this case is Hartford Casualty Insurance Company, Coop Construction's workers' compensation carrier. For ease of reference, we collectively refer to these parties as "Employer."

2. There is no dispute between the parties that Employee is covered by the workers' compensation statute or that the amount of his gross average weekly wage is $408.33. Employee worked as a laborer for Employer for a total of about sixty-two weeks on four occasions: first from October 12, 1999, until December 23, 1999; second from February 28, 2000, until June 16, 2000; third from August 22,

2000, until March 19, 2001; and finally from August 19, 2002, until Employee's death on October 3, 2002.

3. The record before us contains both a video recording of the simultaneous translation of Ms. Pedraza's and Mr. Diaz's Spanish deposition testimony into English and a written transcript of the English translation of both deponents' testimony. Because neither party has challenged on appeal the admissibility of the video recordings or the translations, we do not address this issue.

from the United States monthly to cover the family's expenses.

Mr. Diaz also described his own employment history and the family's general financial circumstances before, during, and after Employee's work in the United States. Before Employee left Mexico to work in the United States, Mr. Diaz testified that Employee contributed between 400 and 500 pesos (about $40 to $50) per month to the household, an amount which constituted the majority of the family's monthly income. Mr. Diaz indicated that he worked only "a little bit" at that time to supplement the family's income, doing agricultural work for two or three days at a time for which he received 70 pesos a day in cash. Once Employee began his work in the United States, Mr. Diaz testified that he worked only sporadically in agriculture for about three more months. Thereafter, Mr. Diaz stated that he stopped working in agriculture or in any field because the monthly wires of funds provided for the household's expenses entirely.[4]

In September 2002, Mr. Diaz began to work again, this time for a local gas company, earning 90 pesos a day. He was not asked the exact date that he began work or whether he worked full- or part-time in September 2002, but he did state that, at the time of the deposition, he worked every other day. After Employee died, Mr. Diaz stated that he continued to work for the local gas company, but his family nevertheless quickly amassed at least 30,000 pesos of debt.

After they had been deposed and had returned to Mexico, Ms. Pedraza and Mr. Diaz searched for receipts related to their son's transfer of funds to them. They located three such receipts. One was an Intermex wire transfer receipt found in Employee's wallet, dated September 5, 2002, for $153.00 that Employee sent to the order of Sara Francisca Diaz Pedraza, Employee's sister. The other two receipts were from Bancomer, a Mexican bank at which Employee's recipients received funds wired to them. One has a stamped date of August 21, 2001, but is otherwise illegible; the second indicates that Mr. Diaz received 1,176.25 pesos (about $116) on May 20, 2002.

The production of these receipts led Employer to request further documents from Intermex Wire Transfers, LLC, which has a Miami, Florida, office. In response to a subpoena duces tecum, Intermex reviewed its records and created a compilation showing that Employee initiated eleven transactions with its service:

4. Mr. Diaz testified to the process by which the family received money from the United States. Beginning in December 1999, Employee would call Mr. Diaz at a public telephone located in Mr. Diaz's village. Employee would tell Mr. Diaz of a "ticket number" which corresponded to a wire transfer that he had made to a local Mexican bank. Mr. Diaz would then take this ticket number to Gregorio Vasquez, a person who facilitated Employee's arrival in the United States and to whom Mr. Diaz owed a 20,000 peso debt for his son's relocation. Mr. Vasquez would go to the bank with the ticket number to collect the transferred funds, about 1000 pesos during at least the first four months. (At another point in the deposition, however, Mr. Diaz indicated that he received $500 per month from Employee for at least the first four months. It is unclear whether Mr. Diaz meant that he kept 500 pesos of the 1000 pesos sent or misspoke as to which currency he meant). Mr. Vasquez would then keep half of the transferred funds and give Mr. Diaz the balance. Mr. Diaz never kept any receipts from these transactions, he testified, because he "never thought about what was going to happen." About a year after Employee began working in the United States, Mr. Diaz stated, the family had retired its debt to Mr. Vasquez. Mr. Diaz then learned from Mr. Vasquez how to collect the funds for himself. Employee last sent the family money in September 2002, Mr. Diaz testified.

| Date | Recipient | Amount |
| --- | --- | --- |
| 5/4/2001 | Sandra Luz Lopez Ramierez[5] | $219.00 |
| 8/23/2001 | Sara Francisca Diaz Pedraza | $150.00 |
| 10/6/2001 | Sara Francisca Diaz Pedraza | $250.00 |
| 11/16/2001 | Sara Francisca Diaz Pedraza | $133.00 |
| 12/8/2001 | Sara Francisca Diaz Pedraza | $111.00 |
| 12/21/2001 | Sara Francisca Diaz Pedraza | $134.00 |
| 1/17/2002 | Albino Diaz Baez | $150.00 |
| 1/27/2002 | Albino Diaz Baez | $450.00 |
| 5/16/2002 | Albino Diaz Baez | $125.00 |
| 6/21/2002 | Sandra Luz Lopez Ramierez | $153.00 |
| 9/5/2002 | Sara Francisca Diaz Pedraza | $153.00 |

Intermex's chief compliance officer, Jose Perez, was deposed and testified to the responsibilities of his position, how the company gathered information from transferors, and how Mr. Perez located records of Employee's transfers in Intermex's system. In his position at Intermex, Mr. Perez testified, he ensured that Intermex remained in compliance with various laws regulating money laundering and other suspicious financial transfers out of the United States. He also described how Intermex captured data when a customer transferred money to Mexico. An Intermex agent in the transferor's locale would, inter alia, key in the name of transferor, the name of the transferee, and the amount of the wire before initiating the transfer. Intermex's computer system stored a record of each transfer, and Mr. Perez's search of the system on Employee's name produced the compilation of data reproduced above. On cross-examination, Mr. Perez stated that there are "hundreds" of wire transfer companies in the United States like the one for which he worked.

The case was tried on December 12, 2005. During a motion in limine, the Consulate argued that the trial court should exclude Mr. Perez's deposition testimony, including the evidence of the eleven Intermex wire transfers, because this evidence did not conform to the requirements of Tennessee Rule of Evidence 803(6), the business records exception to the hearsay rule. In particular, the Consulate argued that (1) Mr. Perez's position did not make him "a person with knowledge and a business duty" to maintain the records to which he testified and (2) the compilation was not "kept in the course of a regularly conducted business activity." Rather, the Consulate characterized the compilation as specifically prepared for litigation and thus outside of the exception. The Consulate ultimately argued that if the evidence from Mr. Perez was stricken from the record, then the uncontradicted deposition testimony of Employee's parents demonstrated that they received monthly financial support from their son to maintain their household, making them "wholly dependent" on his income and thus his "actual dependents" under Tennessee Code Annotated section 50–6–210(c).

Employer strongly resisted Ms. Pedraza's and Mr. Diaz's classification as "actual dependents." Employer countered with its own motion in limine, contending that Ms. Pedraza's and Mr. Diaz's depositions were inadmissible hearsay because they lacked personal knowledge of *Employee's* acts to transfer money to them. At most, they could only testify that *someone* had sent them money. With the parents' depositions excluded, Employer reasoned, the wire transfer receipts and, if admitted, the Intermex data compilation, by themselves were insufficient to prove that Employee "wholly supported" his parents.

Without setting forth its analysis, the trial court ruled against both motions in limine and admitted all proof by deposition. The trial court then made its factual findings. Based on Ms. Pedraza's and Mr. Diaz's testimony, the trial court found that Employee consistently sent money to his parents, whether to them directly or through a third person, while he worked in the United States and that the family had

---

5. Ms. Lopez Ramierez is also Employee's sister.

no means of support other than Employee's income. The court also found that the eleven Intermex wire transfers corroborated the parents' deposition testimony. Because Intermex is one of innumerable wire transfer companies in the United States, and because one of the bank receipts Ms. Pedraza and Mr. Diaz found bore a date (August 21, 2001) that did not correspond to any of Employee's known Intermex transfers,[6] the trial court inferred that Employee used more than one wire transfer company to send money to his parents. These facts led the trial court to find that Mr. Diaz and Ms. Pedraza were "wholly supported" by Employee's income and thus "actual dependents" under the statute.[7]

Employer appealed. Before this case was heard by a Special Workers' Compensation Appeals Panel, we granted review to clarify whether non-resident foreign nationals can qualify as "dependents," either "actual" or "partial," under Tennessee Code Annotated section 50–6–210 and receive benefits due because of an employee's death.

### DISCUSSION

#### 1. Standard of Review

 In a workers' compensation case, "[r]eview of the trial court's findings of fact shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn.Code Ann. § 50–6–225(e)(2) (2005); *see also Rhodes v. Capi-*

tal City Ins. Co., 154 S.W.3d 43, 46 (Tenn. 2004); *Perrin v. Gaylord Entm't Co.*, 120 S.W.3d 823, 825 (Tenn.2003). An appellate court must extend considerable deference to the trial court's factual findings where the trial court has seen and heard witnesses and issues of the credibility or the weight of oral testimony are involved, *Gray v. Cullom Mach. Tool & Die, Inc.*, 152 S.W.3d 439, 442 (Tenn.2004), but it does not grant such deference when reviewing documentary proof or expert testimony presented by deposition, *Lang v. Nissan N. Am., Inc.*, 170 S.W.3d 564, 569 (Tenn.2005). In workers' compensation cases, then, we ultimately conduct an independent review to determine where the preponderance of the evidence lies. *Id.* When we review questions of law, such as matters of statutory construction, we review them de novo without a presumption of correctness. *Perrin*, 120 S.W.3d at 826.

#### 2. Non–Resident Foreign Nationals Can Be "Dependents"

 We begin our analysis with whether Ms. Pedraza and Mr. Diaz, residents and citizens of Mexico, can be "dependents" under our workers' compensation statute. This is a matter of statutory construction. When a statute is clear and unambiguous, a court need look no further than the language of the statute itself to discern the General Assembly's intent. *Corum v. Holston Health & Rehab. Ctr.*, 104 S.W.3d 451, 454 (Tenn.2003). If the language is ambiguous, a court then must look to the statutory scheme as a whole and to legislative history to determine its

---

**6.** Intermex's records showed that Employee transferred $150.00 to his sister Sara on August 23, 2001. The receipt bearing the date August 21, 2001, however, was a receipt from the recipient Mexican bank. It would have been impossible for Employee's sister to receive the money two days before Employee had sent it.

**7.** The trial court did not explicitly analyze whether Employee's support came "at the time of death and for a reasonable period of time immediately prior thereto," as section 50–6–210(c) also requires.

meaning. *Parks v. Tenn. Mun. League Risk Mgmt. Pool,* 974 S.W.2d 677, 679 (Tenn.1998).

Our statute grants death benefits to two types of "dependents," both of whom it defines only in terms of their reliance on the deceased employee's support at the time of death. "Actual dependents" are those whom the deceased "wholly supported" with wages at the time of death. Tenn.Code Ann. § 50–6–210(c) (1999). "Partial dependents" derive only a portion of their support from the deceased employee's wages at the time of death. *Id.* § 50–6–210(d) (1999). Section 50–6–210 does not define or restrict the citizenship or residency status of such recipients.

At the same time, Tennessee Code Annotated section 50–6–227, titled in part "Alien dependents of deceased employee," provides to non-resident foreign nationals a scheme of access to our judicial system if a deceased employee to whom benefits under the workers' compensation statute are due "leaves surviving ... alien ... dependents residing outside of the United States." Tenn.Code Ann. § 50–6–227(a)(1) (1999).[8] Accredited consular officers or their designated representatives are fully authorized to prosecute and settle claims and receive payments on behalf of dependents living outside the United States. *Id.* Our General Assembly could not have more clearly expressed its policy determination that non-resident foreign nationals who qualify as dependents must receive the same treatment under the statute as resident United States citizens. Therefore, we conclude that the plain language of section 50–6–227 permits non-resident foreign nationals to receive death benefits as "dependents" under Tennessee Code Annotated section 50–6–210 when they meet the statutory definitions of dependency.

### 3. *"Actual" v. "Partial" Dependency*

Having determined that non-resident foreign nationals may qualify as dependents under our workers' compensation statute, we now turn to the primary factual dispute in this case: the relative amount of support received by these parents from their deceased son during the applicable time period.

#### A. Admissibility of Evidence

■ Before we reach this case's merits, we must consider the evidentiary issues that the Consulate has raised.[9] We reject the Consulate's arguments against the admission of Mr. Perez's testimony under the business records exception to the hearsay rule and affirm the trial court's decision to admit all of the evidence in this record.

The business records exception, Tennessee Rule of Evidence 803(6), provides, in pertinent part, that

---

8. The General Assembly subsequently amended this provision to authorize workers' compensation specialists to conduct a benefits review for non-resident alien dependents before they file a complaint in a trial court. *See* Tenn.Code Ann. § 50–6–227(a)(1)(A) (2005).

9. Though Employer raised hearsay objections to Ms. Pedraza's and Mr. Diaz's testimony in the trial court, Employer first raised these hearsay issues to this Court in its reply brief. Tennessee Rule of Appellate Procedure 27(c) provides that "[t]he appellant may file a brief in reply to the brief of the appellee." Nothing in the Consulate's brief should have prompted Employer to raise this hearsay issue in reply; therefore, we decline to consider the issue. Our intermediate appellate courts have routinely declined to consider issues in very similar situations. *See, e.g., Gentry v. Gentry,* No. E2000–02714–COA–R3–CV, 2001 WL 839714, at *4 n. 3 (Tenn.Ct.App. July 25, 2001); *Hobbs v. State,* No. 03C01–9303–CR–00071, 1995 WL 39349, at *2 n. 1 (Tenn.Crim.App. Feb. 2, 1995); *Wilson v. Parnell,* No. 03A01–9210–CV–00381, 1993 WL 38157, at *4 (Tenn.Ct.App. Feb. 17, 1993).

[a] ... record[ ] or data compilation ... made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the ... record or data compilation

is admissible despite it being hearsay.

 First, the Consulate objects to Mr. Perez's testimony because he was not "a person with knowledge and a business duty to record or transmit," or a qualified custodian of, the records under the exception. This argument does not persuade us. "Whatever his or her title[,]" to qualify as a custodian under the exception, "the witness must be able to testify as to the identity of the record, the mode of preparation, and whether the record was made in the regular course of business at or near the time of the recorded event." *State v. Baker*, 842 S.W.2d 261, 264 (Tenn.Crim. App.1992). In addition, "[i]t is sufficient if the person laying the foundation for the record testifies that the regular business procedure is for a person with personal knowledge of the recorded event to provide information or make the entry." Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.11[4] (5th ed.2005); *see also Witter v. Nesbit*, 878 S.W.2d 116, 122 (Tenn.Ct.App.1993). Though Mr. Perez was Intermex's chief compliance officer, with the duties already described above, and not the local Intermex agent who processed Employee's transactions, Mr. Perez nevertheless testified in detail to all of the *Baker* requirements and to the process by which a local Intermex agent keyed in data to Intermex's database at the time of each transfer.

 Second, the Consulate argues that Mr. Perez's testimony regarding the compilation of the eleven Intermex trans-fers does not satisfy the exception because the compilation was made in preparation for litigation years after Employee's transaction, not "at or near the time" that Employee wired funds via Intermex. This argument also does not persuade us, for two reasons. First, Tennessee Rule of Evidence 1006 permits a trial court to admit a "summary" of "voluminous writings." Such a summary, like the one at issue in this case, would, by necessity, be prepared in anticipation of litigation. *See Alexander v. Inman*, 903 S.W.2d 686, 702 (Tenn.Ct.App.1995). Second, so long as the data included in a compilation otherwise satisfies the business records exception, the fact that a compilation of admissible business records was created during litigation does not disqualify it as a business record under the exception. *See, e.g.,* 29A Am.Jur.2d *Evidence* § 1303 (1995); *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35, 65–67 (2006); *J.L. v. State*, 789 N.E.2d 961, 965 (Ind.App.2003). Mr. Perez's testimony supports a finding that each piece of data on the compilation complies with the business records exception: (1) as discussed above, Mr. Perez's testimony is, as a matter of law, "by a person with knowledge and a business duty to record or transmit" the data in question; (2) Mr. Perez stated that an Intermex agent input into their computer system data regarding a transfer when a transaction was initiated, constituting a "record ... made ... at or near the time" of "a regularly conducted business activity;" and (3) Mr. Perez's testimony showed that it was "the regular practice of that business activity to make the ... record" because Mr. Perez indicated that Intermex stored data from each and every transaction it handled in its computer database. Therefore, it was within the discretion of the trial court to admit Mr. Perez's testimony and the com-

pilation under the exception. We affirm the trial court's ruling on this issue.

### B. Ms. Pedraza and Mr. Diaz are "partial dependents"

■ Having decided, as the trial court did, to admit all of the evidence in this record, we reach this case's merits. We hold that Ms. Pedraza and Mr. Diaz are only "partial dependents" under the statute because Mr. Diaz earned income "at the time of [Employee's] death and for a reasonable period of time immediately prior thereto."

To qualify as an "actual dependent," Ms. Pedraza and Mr. Diaz must have been "[a m]other [or] father ... who [was] wholly supported by the deceased employee at the time of death and for a reasonable period of time immediately prior thereto." Tenn. Code Ann. § 50–6–210(c) (1999). By contrast, Ms. Pedraza and Mr. Diaz were only "partial dependents" if they were "[a] member of a class named in subsection (c) who regularly derived *part* of such mem-

ber's support from the wages of the deceased employee at the time of death and for a reasonable period of time immediately prior thereto." Tenn.Code Ann. § 50–6–210(d) (1999) (emphasis added).[10] Thus, we must focus our inquiry on whether Employee "wholly" or in "part" supported his parents and whether that support came "at the time of death and for a reasonable period of time immediately prior thereto." [11]

Although noted by the trial court only in passing, it is undisputed in the record that, at the time of Employee's death and immediately prior to that time, Mr. Diaz worked and earned money for the benefit of his household. Beginning in September 2002, Mr. Diaz returned to work at a local gas company, earning 90 pesos per day for an unspecified number of days per week. On October 3, 2002, Employee died. Thus, we conclude that Mr. Diaz and Ms. Pedraza were not "wholly supported" by Employee "at the time of [his] death." As a matter of law, we hold that Employee's parents were "partial dependents" [12] at the time of

10. In its supplemental brief, Employer conceded that Employee's parents qualify as "partial dependents."

11. Sections 50–6–209 and 50–6–210 draw distinctions between a decedent employee who has no dependents, "actual dependents," and "partial dependents" to guide a calculation of the benefit due to a decedent employee's family. If a decedent employee leaves no dependents who qualify under the statute, then a $20,000 lump sum payment is due to the employee's estate. Tenn.Code Ann. § 50–6–209(b)(2) (1999). Assuming the absence of a dependent spouse or dependent children, then two parents in 2002 who are "actual dependents" are due 35% of the decedent's average weekly wage. *Id.* § 50–6–210(e)(6) (1999). If one parent subsequently dies, then the benefit falls to 25% of the decedent's average weekly wage. *Id.* This weekly benefit for two dependent parents, however, is capped at the statutorily defined "maximum weekly benefit," *Id.* § 50–6–210(e)(10) (1999): 66 2/3% of the decedent's average wage, *Id.* § 50–6–

102(14)(A)(viii) (Supp.2002), for 400 weeks, *Id.* § 50–6–102(13)(C) (Supp.2002). Using these formulas, the trial court correctly calculated that Ms. Pedraza and Mr. Diaz, if they were actual dependents, were jointly due $142.92 per week ($408.33 multiplied by 35%), reduced to $102.08 if one of them died ($408.33 multiplied by 25%), up to an absolute maximum of $108,888 ($408.33 multiplied by 66 2/3% multiplied by 400 weeks). However, if a mother and father are only "partial dependents," as we hold that Ms. Pedraza and Mr. Diaz are, then the benefit is calculated as above but is then prorated to reflect the percentage of total support that the decedent employee contributed to the parental household "at the time of, and for a reasonable time immediately prior to" an employee's death. *Id.* § 50–6–210(e)(9) (1999).

12. Mr. Diaz was not asked how many days per month he worked in September 2002, but he did testify that, as of the date of his deposition, he worked every other day. We note that, if he worked every other business day, or

his death[13] and thus reverse the judgment of the trial court below on this issue. Because we cannot determine from the record the total award due to the parents, we remand this case to the trial court for a determination of the benefit due to the parents as "partial dependents" under Tennessee Code Annotated section 50–6–210(d).

## CONCLUSION

We hold that non-resident foreign nationals can be actual or partial dependents under Tennessee's workers' compensation statutes. In this case, we affirm the trial court's judgment that the decedent employee's parents were "dependents," but we reverse the trial court's finding that they were "actual dependents" under the statute because Mr. Diaz earned some income of his own "at the time of [Employee's] death." Thus, we remand the case for further proceedings consistent with this opinion, including for a determination of the benefit due to the parents as "partial dependents" under Tennessee Code Annotated section 50–6–210(d).

On remand, the trial court shall determine the appropriate proration factor to apply in this case. Specifically, the trial court shall find (1) the parents' total household income for a relevant measuring period, (2) Mr. Diaz's contribution to the household's income "at the time of [Employee's] death and for a reasonable period of time immediately prior" to Employee's death, and (3) Employee's contribution to the household's income "at the time of [Employee's] death and for a reasonable period of time immediately prior" to Employee's death. If the existing record is inadequate to make these findings, the parties may supplement the record. We encourage the parties to employ cost-effective means to gather any missing facts, such as obtaining affidavits from the parents.

In its original brief, the Consulate contended that the appeal in this case was frivolous. In light of our partial reversal of the trial court's judgment, the appeal is clearly not frivolous. Accordingly, the Consulate's request for such a determination is denied.

Costs for this appeal are taxed one-half to each party: (1) Coop Construction Co., LLC and Hartford Casualty Insurance Company, and (2) George R. Fusner, Jr., as designated representative of the Mexican Consulate, and their respective sureties, for which execution may issue if necessary.

---

ten days per month, at 90 pesos per day, then he earned nearly as much as Mr. Diaz testified that Employee contributed to the household's support near the time of his death.

**13.** Because we have concluded that Mr. Diaz and Ms. Pedraza are partial dependents, we do not need to address Employer's arguments that citizens and residents of Mexico cannot ever be "wholly supported" by an employee and thus be "actual dependents" because they enjoy "the use and protection of the Mexican army, the use of its courts and government offices, of Mexico's highways, roads parks, lakes, oceans, and lands and all benefits and services provided by the local government related to sanitation, trash, and basic services."